UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ZB, N.A., dba California Bank & Trust, successor by merger to California Bank & Trust, a California banking corporation, <br><br> Plaintiff, <br><br> v. <br><br> SHILO INN, MOSES LAKE, INC., a Washington corporation; MOSES LAKE FOOD MART, INC., a Washington corporation; and KOHLI INVESTMENT, INC., d/b/a Sunval Express, a Washington corporation, <br><br> Defendants. | Case No. 2:12-CV-00161 LRS <br><br><br> **ORDER RE: SALE OF SHILO INN, MOSES LAKE, INC.** |

Having read and considered the Stipulation (ECF No. 224) regarding Sale of Shilo Inn, Moses Lake, Inc. submitted by Defendant Shilo Inn, Moses Lake, Inc., a Washington corporation ("Shilo Moses Lake" or "Shilo"); Plaintiff ZB, N.A., dba California Bank & Trust, successor by merger to California Bank & Trust, a California banking corporation, ("CB&T" or "Plaintiff") (Shilo Moses Lake, and Plaintiff shall be referred to collectively as the "Parties"); by and through their respective counsel of record, and the Court-appointed receiver, Trigild, Inc. (the

ORDER - 1

"Receiver"), the Court hereby makes the following Order.

For purposes of this Order, the following terms are defined: that certain real property located in Moses Lake, Washington, and more particularly described in Exhibit A, attached hereto (the "Moses Lake Property"); cross-collateralized with a loan to Shilo Inn Seaside East LLC, (the "Seaside Loan"); the secured revolving line of credit loan to Mark S. Hemstreet ("Hemstreet") in the original principal amount not to exceed $5,000,000 ("Hemstreet Loan"); Somnath Motel, LLC, an arms-length third party buyer ("Buyer"); $2,650,000.00 ("Purchase Price"); loan to Shilo Inn Seaside East LLC, (the "Seaside Loan"); loan to Shilo Moses Lake, Inc. (the "Moses Lake Loan"); and the Stipulation Regarding Sale of Shilo Inn Seaside East Property, a copy of which is attached as Exhibit B ("Seaside Sale Stipulation").

## ORDER

1.  The Moses Lake Property shall be sold to Buyer for the Purchase Price pursuant to the Purchase Agreement attached as Exhibit C.  The Receiver is authorized to, and shall, execute any and all documents and take all actions that may be necessary and appropriate to effectuate and consummate the sale of the Moses Lake Property to Buyer.

2.  The Net Proceeds and the Net Receivership Funds (as defined below) shall be paid to Plaintiff and applied as follows: (a) first to the total indebtedness on the Moses Lake Property, and (b) any remainder to be applied as a partial payment of

the total amount due and owning under the applicable loan documents for the Seaside Loan, Moses Lake Loan, Hemstreet Loan, and the Seaside Sale Stipulation.

3.  The Net Sales Proceeds shall constitute the reasonable and fair market value of the Moses Lake Property for the purposes of determining the deficiency judgment owed to Plaintiff in this case, and Defendants hereby consent to, and waive any and all defenses to, entry of such subsequent deficiency judgment, which shall be calculated as (A) the total indebtedness owing under the Moses Lake Loan and (B) the total amount due and owing under the applicable loan documents for the Seaside Loan, Moses Lake Loan, and the Hemstreet Loan in accordance with the Seaside Sale Stipulation, less the Net Receivership Proceeds and any other payments received by Plaintiff on account of such liens before entry of such deficiency judgment.

4.  Upon the recording of the warranty deed conveying title to Buyer, the Receiver shall relinquish possession of the Moses Lake Property to Buyer per the terms of this Court's Order Appointing Receiver.

5.  As soon as practicable after completion of the Proposed Sale, the Receiver shall bring a Motion for an Order Approving Receiver's Final Report and Accounting.  Upon approval of the Receiver's Final Accounting, the Receiver shall pay to Plaintiff all net receivership funds after payment of all authorized Receiver fees and expenses (the "Net Receivership Funds"). Defendants hereby waive any and all claims they may have to the Net Receivership Funds.

ORDER - 3

6.  If the Proposed Sale is not consummated for any reason, Plaintiff is entitled to pursue and enforce any and all of its rights and remedies under the applicable Loan Documents, Guarantees, court orders and judgments, and applicable law as referenced above.

7.    This case shall remain open after the completion of Proposed Sale pending entry of final judgment on Plaintiff's claims for deficiency judgments against the defendants in this action.

8.    The parties Stipulated Motion for Order of Sale of Shilo Inn, Moses Lake, Inc. (**ECF No. 224**) is **GRANTED**.

**IT IS SO ORDERED.**

DATED this 26th day of September, 2016.

*s/Lonny R. Suko*
_____
LONNY R. SUKO
Senior United States District Court Judge

ORDER - 4

# EXHIBIT A

The land referred to in this commitment is described as follows:
Lot 2, Shilo Short Plat, according to the plat thereof recorded in Volume 3 of Short Plats, page 42, records of Grant County, Washington, being a portion of Farm Unit 124, Irrigation Block 41, Columbia Basin Project, and a portion of the Northwest quarter of the Northeast quarter of Section 36, Township 19 North, Range 28 E.W.M., described as follows:
Commencing at the North quarter corner of said Section 36; thence South 89°20'15" East, 702.37 feet along the North line of said Section 36; thence South 00°39'45" West, 30 feet to the True Point of Beginning; thence South 00°39'45" West, 468.82 feet to a point on the Northerly right of way of S.R. 90 Highway; thence Westerly 140.61 feet along a 375 feet radius curve to the left (whose long chord bears South 79°52'18" West, 139.79 feet); thence North 80°52'21" West, 43.75 feet to a point 75 feet perpendicular to the center line of S.R. 17 Highway; thence North 35°52'41" West, 287.31 feet; thence South 89°20'15" East, 73.17 feet; thence North 00°39'45" East, 182.99 feet; thence North 03°42'02" West, 59.91 feet; thence North 00°39'45" East, 15 feet to a point on the Southerly right of way line of Kittleson Road; thence along said right of way line South 89°20'15" East, 283.04 feet to the True Point of Beginning.

<div align="center">Schedule 1 to UCC-1 Financing Statement</div>

Debtor:            SHILO INN, MOSES LAKE, INC.
Secured Party:     CALIFORNIA BANK & TRUST, as assignee of the FDIC, as receiver for Vineyard Bank, N.A.

<u>Item No. 4</u>:

Debtor has granted to Secured Party a security interest in the following (collectively, the "**Collateral**"), some or all which may be located on the real property described on <u>Exhibit "A"</u> attached hereto and incorporated herein by this reference (the "**Real Property**"):

All of Debtor's right, title and leasehold interest in and to the Real Property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the Real Property including without limitation all minerals, oil, gas, geothermal and similar matters.

Together with all of Debtor's right, title and interest in and to all present and future leases of the Real Property and the improvements located thereon and all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived therefrom.

Together with the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)     All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the Collateral described herein, whether added now or later.

(B)     All products and produce of any of the Collateral.

(C)     All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the Collateral.

(D)     All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral, and sums due from a third party who has

<div align="right">Exhibit A</div>

damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)     All records and data relating to any of the Collateral, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

(F)     All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Fixtures, as such terms are defined in the Uniform Commercial Code.

### EXHIBIT A
### To UCC-1 Financing Statement
### REAL PROPERTY

That certain real property located in the County of Grant, State of Washington and described as follows:

Lot 2, Shilo Short Plat, according to the plat thereof recorded in Volume 3 of Short Plats, page 42, records of Grant County, Washington, being a portion of Farm Unit 124, Irrigation Block 41, Columbia Basin Project, and a portion of the Northwest quarter of the Northeast quarter of Section 36, Township 19 North, Range 28 E.W.M., described as follows:

Commencing at the North quarter corner of said Section 36; thence South 89°20'15" East, 702.37 feet along the North line of said Section 36; thence South 00°39'45" West, 30 feet to the True Point of Beginning; thence South 00°39'45" West, 468.82 feet to a point on the Northerly right of way of S.R. 90 Highway; thence Westerly 140.61 feet along a 375 feet radius curve to the left (whose long chord bears South 79°52'18" West, 139.79 feet); thence North 80°52'21" West, 43.75 feet to a point 75 feet perpendicular to the center line of S.R. 17 Highway; thence North 35°52'41" West, 287.31 feet; thence South 89°20'15" East, 73.17 feet; thence North 00°39'45" East, 182.99 feet; thence North 03°42'02" West, 59.91 feet; thence North 00°39'45" East, 15 feet to a point on the Southerly right of way line of Kittleson Road; thence along said right of way line South 89°20'15" East, 283.04 feet to the True Point of Beginning.

Exhibit A

# EXHIBIT B

Joseph A.G. Sakay, OSB #021734
Eric D. Lansverk, OSB #144700
(Admitted *Pro Hac Vice*)
HILLIS CLARK MARTIN & PETERSON P.S.
1221 Second Avenue, Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Hal Mark Mersel, CSB #130382
(Admitted *Pro Hac Vice*)
Ren R. Hayhurst, CSB #142528
(Admitted *Pro Hac Vice*)
BRYAN CAVE LLP
3161 Michelson Drive, Suite 1500
Irvine, CA  92612
Telephone: (949) 223-7000
Facsimile: (949) 223-7100
Attorneys for Plaintiff California Bank & Trust

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CALIFORNIA BANK & TRUST, as assignee of the Federal Deposit Insurance Corporation, as receiver for Vineyard Bank, a California banking corporation,<br><br>Plaintiff,<br><br>v.<br><br>SHILO INN, SEASIDE EAST, LLC, an Oregon limited liability company; and MARK S. HEMSTREET, an Oregon resident,<br><br><div align="center">Defendants.</div> | Case No. 3:12-CV-00506-HZ (Lead Case)<br><br>   3:12-CV-00508-HZ (Trailing Case)<br>   3:12-CV-00509-HZ (Trailing Case)<br><br>**STIPULATION REGARDING SALE OF SHILO INN SEASIDE EAST PROPERTY** |

*Stipulation for Sale of Shilo Inn Seaside, East - 1*

Exhibit B

## INTRODUCTION

Defendant Shilo Inn, Seaside East, LLC, an Oregon limited liability company ("Shilo");

Defendant Mark S. Hemstreet, an Oregon resident ("Hemstreet") (collectively the "Borrowers"

or "Defendants"); Plaintiff California Bank & Trust as assignee of the Federal Deposit Insurance

Corporation, as receiver for Vineyard Bank, a California banking corporation, ("CB&T" or

"Plaintiff") (Shilo, Hemstreet, and Plaintiff shall be referred to collectively as the "Parties"); by

and through their respective counsel of record, and the Court-appointed receiver, Trigild, Inc.

(the "Receiver") hereby stipulate to a sale of the Seaside Property pursuant to the terms below.

## RECITALS

A.      On or about August 3, 2005, Plaintiff provided financing to Shilo in the original

principal amount of $2,000,000 ("Seaside Loan").  The Seaside Loan is evidenced, in part, by the

following documents:

(1)      A Promissory Note, dated August 3, 2005, executed by Shilo, payable to Plaintiff,

in the original principal amount of $2,000,000 ("Seaside Promissory Note");

(2)      A first lien Deed of Trust dated August 3, 2005, recorded August 10, 2005, as

Instrument No. 200509541 in the official records of Clatsop County, Oregon ("Seaside First

Deed of Trust"), against certain real property located in Seaside Oregon, and more particularly

described in Exhibit A, attached hereto (the "Seaside Property");

(3)      A first Amended Deed of Trust, dated November 4, 2010, recorded

November 17, 2010 as Instrument No. 201009901, in the official records of Clatsop County,

Oregon against the Seaside Property ("Seaside First Amendment");

(4)      A Forbearance and Second Amended Deed of Trust dated as of June 30, 2011

("Seaside Second Amendment"); AND

*Stipulation for Sale of Shilo Inn Seaside, East - 2*

**HILLIS CLARK MARTIN & PETERSON P.S.**
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

(5)     All of the documents evidencing the Seaside Loan, the "Moses Lake Loan" (as defined below), and such other agreements described herein (including without limitation the "2013 Agreement" and the "2015 Agreement" (both as defined below) are all expressly entered into pursuant to the laws of California, which law applies to the enforcement and interpretation of all rights, obligations, duties and remedies of the Parties thereto, except as otherwise set forth in the applicable deeds of trust.

B.     Per the terms of the Seaside Loan, the Seaside Loan is cross-defaulted and cross-collateralized with a loan to Shilo Inn Moses Lake, Inc ("Shilo Moses Lake") in the original principal amount of $3,000,000 ("Moses Lake Loan").  Accordingly, the Moses Lake Loan also encumbers the Seaside Property.

C.     Separate and apart from the Seaside Loan and Moses Lake Loan, on or about April 19, 2005, Plaintiff made an unsecured revolving line of credit loan to Hemstreet in the original principal amount not to exceed $5,000,000 ("Hemstreet Loan").  The Hemstreet Loan is evidenced, in part, by a Promissory Note, dated April 19, 2005, executed by Hemstreet, payable to Plaintiff, in the original principal balance not to exceed $5,000,000 ("Hemstreet Promissory Note"), as amended by a Loan Modification Agreement, dated November 4, 2010 ("First Hemstreet Amendment"), and by a Forbearance and Second Amendment to Deeds of Trust and Other Loan Documents, dated June 30, 2011, ("Second Hemstreet Amendment") and secured by a second lien Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement (and Fixture Filing) on the Seaside Property, recorded on November 17, 2010, as instrument number 201009902, and re-recorded December 17, 2010, as Instrument No. 201010771, both in the official records of Clatsop County, Oregon ("Hemstreet Deed of Trust").

*Stipulation for Sale of Shilo Inn Seaside, East - 3*

**HILLIS CLARK MARTIN & PETERSON P.S.**
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

D.     The Seaside Loan, Moses Lake Loan and Hemstreet Loan shall be collectively referred to as the "Loans."

E.     Defendants defaulted on the Loans.

F.     In 2012, Plaintiff filed this action seeking full repayment of the Loans and, among other things, to judicially foreclose on the Seaside Property.

G.     On January 28, 2013, the Parties entered into an Agreement which provided for, among other things, a discounted payoff of the Loans on or before April 30, 2013 (the "2013 Agreement").

H.     Defendants did not perform under the 2013 Agreement and on May 1, 2013 filed for Chapter 11 Bankruptcy.  This action was dismissed without prejudice in the meantime, subject to reopening.

I.     After Defendants failed to confirm any plans of reorganization, the action was reopened to complete foreclosure.

J.     Shortly thereafter, the Parties entered into a May 5, 2015 Agreement (the "2015 Agreement").  The Agreement provided that this action would be dismissed without prejudice, subject to Shilo and Hemstreet making various payments to Plaintiff by March 31, 2016.  The 2015 Agreement also provided that if those payments were not made on or before March 31, 2016, that Plaintiff could immediately, and without first providing notice to Defendants, reopen the action through a pre-executed stipulation and complete the judicial foreclosure process.

K.     Per the May 2015 Agreement, in June 2015, this action was dismissed without prejudice subject to reopening.

*Stipulation for Sale of Shilo Inn Seaside, East - 4*

**HILLIS CLARK MARTIN & PETERSON P.S.**
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

L.      On December 31, 2015, CB&T merged its banking charter with the charters of all other banks owned by its parent company, Zions Bancorporation.  The consolidated bank is known as ZB, N.A. but continues to operate in California as CB&T, as a division of ZB, N.A. under the following designation: "ZB, N.A., dba California Bank & Trust, successor by merger to California Bank & Trust, a California banking corporation."

M.      Defendants breached the 2015 Agreement by failing to make the payments due on March 31, 2016.

N.      As a result, on April 4, 2016, pursuant to the 2015 Agreement, Plaintiff commenced the reopening of this action to complete judicial foreclosure.

O.      On April 11, 2016, this action was reopened.  According to the terms of the 2015 Agreement and pre-executed stipulations, on April 13, 2016, the Court also appointed Trigild, Inc. of San Diego, California ("Receiver") as receiver.

P.      Defendants have been marketing the Seaside Property for sale at least since the May 1, 2015 Agreement was executed.  Defendants have now negotiated a proposed sale (the "Proposed Sale") of the Seaside Property to Seaside Param, LLC, an arms-length third party buyer ("Buyer"), for the total purchase price of $3,700,000.00 ("Purchase Price"), and have sought the approval of the Plaintiff and the Receiver to consummate the sale.  The Parties agree that the net sale proceeds will be approximately $3,457,005.60, subject to adjustments to tax prorations depending on the actual date of closing reflected on the final approved settlement statement (the "Net Proceeds"), and the Parties and the Receiver agree that the gross sales price represents the fair market value for the Seaside Property.

*Stipulation for Sale of Shilo Inn Seaside, East - 5*

Exhibit B

**AGREEMENT**

1.        Defendants agree that the total debt owing to Plaintiff and secured by the Seaside

Property is comprised of the aggregate of the total debt owed to Plaintiff on the Seaside Loan,

the Hemstreet Loan, and the cross-collateralized Moses Lake Loan, each of which encumber the

Seaside Property.

2.        The Seaside Property will be sold to Buyer for the Purchase Price pursuant to the

Purchase Agreement attached as <u>Exhibit B</u>.  The Parties agree that the Receiver is authorized to,

and shall, execute any and all documents and take all actions that may be necessary and

appropriate to effectuate and consummate the sale of the Seaside Property to Buyer.

3.        The Parties agree that all of the Net Proceeds will be paid to Plaintiff and applied

as follows: (a) first to pay in full the total indebtedness on the Seaside Loan, and (b) any

remainder to be applied as a partial payment of the Moses Lake Loan.  The Parties agree that the

Net Sales Proceeds shall constitute the fair market value of the Seaside Property for the purposes

of determining the deficiency judgment owed to Plaintiff in this case, and Defendants hereby

consent to, and waive any and all defenses to, entry of such subsequent deficiency judgment,

which shall be calculated as the total indebtedness under the Seaside Loan, Moses Lake Loan

and Hemstreet Loan, less the Net Receivership Proceeds and any other payments received by

Plaintiff on account of such liens before entry of such deficiency judgment.

4.        Upon the recording of the warranty deed conveying title to Buyer, the Receiver

will relinquish possession of the Seaside Property to Buyer per the terms of this Court's Order

Appointing Receiver.

5.        As soon as practicable after completion of the Proposed Sale, the Receiver will

bring a Motion for an Order Approving Receiver's Final Report and Accounting.  Upon approval

**HILLIS CLARK MARTIN & PETERSON P.S.**
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

of the Receiver's Final Accounting, the Receiver shall pay to Plaintiff all net receivership funds

after payment of all authorized Receiver fees and expenses (the "Net Receivership Funds").

Defendants hereby waive any and all claims they may have to the Net Receivership Funds.

      6.      Except as set forth in this Stipulation, the Parties do not waive, relinquish, release,

amend, or modify any of their rights or remedies under the loan documents relating to the

Seaside Loan, Moses Lake Loan, Hemstreet Loan, any of the other loans in the related Shilo Inn

cases in the federal courts of Oregon, Washington, and Idaho (the "Shilo Inn Cases") [1], or any

rights and remedies conferred by applicable law or prior court orders.

      7.      The Parties expressly acknowledge and agree that the consummation of the

Proposed Sale or any other provision of this Stipulation shall (i) constitute voluntary payments to

the extent the payments are deemed to be made under the Loan Documents, and (ii) all such

payments shall be credited against the total sum due and owing under the Loan Documents and

this Stipulation in the manner provided in this Stipulation and the Loan Documents.  Any

payments made as a result of the Proposed Sale or any other provision of this Stipulation are

voluntarily made by Defendants to reduce the balance due and owing Plaintiff under the Loans

and this Stipulation and are not the result of any "action" by Plaintiff as may be contemplated

under California Code of Civil Procedure section 726, or any other equivalent statute in any

other jurisdiction.  Such payments shall not (a) constitute a waiver of any of Plaintiff's rights and

remedies under the Loan Documents; (b) prevent or prohibit Plaintiff from pursuing such rights

and remedies in a manner consistent with the terms of the Loan Documents; (c) cure or excuse

---

[1] 1) *CB&T v. Shilo Inn, Moses Lake, Inc.* (USDC of Washington Case No. 2:12-CV-00161); 2) *CB&T v. Shilo Inn, Nampa Blvd, LLC* (USDC of Idaho Case No. 1:12-cv-00142); 3) *CB&T v. Shilo Inn, Twin Falls, LLC* (USDC of Idaho Case No. 1:12-cv00143); 4) *CB&T v. Shilo Inn, Newberg, LLC* (USDC of Oregon Case No. 3:12-cv-508-hz); 5) *CB&T v. Shilo Inn, Rose Garden, LLC* (USDC of Oregon Case No. 3:12-CV-509-hz); 6) *CB&T v. Shilo Inn Boise, LLC* (USDC of Idaho Case No. 1:12-cv00141)

*Stipulation for Sale of Shilo Inn Seaside, East - 7*

**HILLIS CLARK MARTIN & PETERSON P.S.**
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

Defendants' defaults under the Loans; (d) be deemed or constitute a waiver or violation of any party's rights and remedies under California Code of Civil Procedure sections 580a, 580b, 580c, 580d and/or 726, or their equivalent statutes in other jurisdictions; or (e) be deemed or constitute an "action" for purposes of California Code of Civil Procedure section 726, or its equivalent statute in any other jurisdiction.

8.      If the Proposed Sale is not consummated for any reason, Plaintiff is entitled to pursue and enforce any and all of its rights and remedies under the applicable Loan Documents, Guarantees, court orders and judgments, and applicable law as referenced above.

9.      To reflect the recent change in Plaintiff's corporate structure, and for all future pleadings and orders related to this action and the Shilo Inn Cases, the Parties agree Plaintiff's new name shall be "ZB, N.A., dba California Bank & Trust, successor by merger to California Bank & Trust, a California banking corporation."

10.      In order to maintain the pending related actions, if the current Lead Case (3:12-CV-00506-HZ) is completed, removed, or dismissed, then the current Trailing Case under cause number 3:12-CV-00509-HZ will automatically become the Lead Case.

Dated:  June 3, 2016            **TRIGILD, INC.**


                               By:   *s/Bill Hoffman*
                               _____
                                      Bill Hoffman
                               Court-Appointed Receiver


Dated:  June 3, 2016            **GREENE & MARKLEY, P.C.**


                               By:   *s/Charles R. Markley*
                               _____
                                      Charles R. Markley
                               Attorneys for Defendants,
                               SHILO INN SEASIDE EAST, LLC and MARK
                               S. HEMSTREET

*Stipulation for Sale of Shilo Inn Seaside, East - 8*

HILLIS CLARK MARTIN & PETERSON P.S.
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

Dated:  June 3, 2016                    **BRYAN CAVE LLP**


                                        By:   *s/H. Mark Mersel*
                                              H. Mark Mersel
                                        Attorneys for Plaintiff
                                        CALIFORNIA BANK & TRUST


PRESENTED BY:                           **HILLIS CLARK MARTIN & PETERSON P.S.**

                                        By: *s/Eric D. Lansverk*                    .
                                            Joseph A.G. Sakay, OSB #021734
                                            Eric D. Lansverk, OSB #144700
                                            1221 Second Avenue, Suite 500
                                            Seattle, Washington 98101-2925
                                            Telephone: (206) 623-1745
                                        Attorneys for Plaintiff
                                        CALIFORNIA BANK & TRUST


*Stipulation for Sale of Shilo Inn Seaside, East - 9*

HILLIS CLARK MARTIN & PETERSON P.S.
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2016, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following:

| | |
|---|---|
| Charles R. Markley | charles.markley@greenemarkley.com; |
| | norah.cartier@greenemarkley.com |
| | |
| Sherri Martinelli | sherri.martinelli@greenemarkley.com; |
| | lori.pavey@greenemarkley.com |
| | |
| Christian Boenisch | boenischc@co.yamhill.or.us |

DATED this 3rd day of May, 2016 at Seattle, Washington.

<u>s/Eric D.Lansverk</u>
Joseph A.G. Sakay, OSB #021734
Eric D. Lansverk, OSB #144700
HILLIS CLARK MARTIN & PETERSON, P.S.
1221 Second Avenue, Suite 500
Seattle, Washington  98101-2925
Telephone:  (206) 623-1745
Facsimile:  (206) 623-7789
Attorneys for Plaintiff

*Stipulation for Sale of Shilo Inn Seaside, East - 10*

**HILLIS CLARK MARTIN & PETERSON P.S.**
1221 Second Avenue,  Suite 500
Seattle, Washington  98101-2925
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Exhibit B

# EXHIBIT A

Exhibit B

EXHIBIT "A"

LEGAL DESCRIPTION

PARCEL NO. 1:
Beginning at a point in the county road leading from Skipanon Landing to Seaside 11.48 chains West of the quarter Section post on the East line of Section 21, Township 6 North, Range 10 West of the Willamette Meridian;
    thence South along the center line of said county road a distance of 558.43 feet;
    thence West to the West line of said county road to a point which is the Northeast corner of that certain tract of real estate conveyed by A. M. Smith and Anna F. Smith to Nettie C. Allen and N. C. Allen by Deed recorded in Book 104, page 637, Clatsop County Records, which said point is the point of beginning of the tract of land herein conveyed;
    thence West along the North line of said N. C. Allen and Nettie Allen tract a distance of 100 feet;
    thence running North and parallel to said county road a distance of 50 feet;
    thence running East along the South line of that certain tract conveyed by A. M. Smith and Anna F. Smith to Annie Plummer by Deed recorded in Book 108, page 174, Clatsop County Records, to the West line of said county road;
    thence running South along the West line of said county road to said Northeast corner of said Nettie C. Allen and N. C. Allen tract, the point of beginning of the land herein conveyed, in Section 21, Township 6 North, Range 10 West of the Willamette Meridian, in the City of Seaside, County of Clatsop, State of Oregon.

PARCEL NO. 2:
That part of the Elizabeth Lattie Donation Land Claim described as follows:
    Beginning at a point in the county road leading from Skipanon Landing to Seaside 11.28 chains West of the quarter Section post on the East line of Section 21, Township 6 North, Range 10 West, Willamette Meridian (run at angle to the East line of said Section 21);
    thence South 2-1/2° West 558.43 feet;
    thence West to the West line of said county road which is the Northeast corner of the tract of land described and conveyed herein;
    thence West 5.87 chains to low water mark of the Necanicum River;
    thence South along low water mark of said river 108 feet to the Northwest corner of tract of land conveyed by A. M. Smith to George Lapay;
    thence East along the North line of said tract conveyed by A. M. Smith to George Lapay to the Northeast corner thereof, which point is a point on the West line of said county road 108 feet South of the point of beginning for the description of the tract herein conveyed;
    thence North along the West line of said county road a distance of 108 feet to the place of beginning, the said tract being 108 feet North and South and running from the county road to low water mark of the Necanicum River and adjoining said George Lapay tract on the North, the said George Lapay tract being described in that certain Deed recorded in Book 95, page 450, Clatsop County Records, situated in the County of Clatsop, State of Oregon.

Exhibit B

# EXHIBIT B

## SHILO INN SEASIDE EAST
## PURCHASE AND SALES AGREEMENT

DATE:               December 11, 2015 ("Effective Date")

SELLER:             Shilo Inn, Seaside East, LLC, an Oregon limited liability company
                    11600 SW Shilo Lane
                    Portland, Oregon 97225

BUYER:              Ganesh Sonpatki

Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller the real property and improvements, and related personal property, described below on the terms and conditions set forth in this Shilo Inn Seaside East Purchase and Sales Agreement (the "PSA"):

1.      **The Hotel.** The property to be sold under this PSA is as follows:

1.1     A parcel of real property and the improvements located on the real property commonly known as the SHILO INN SEASIDE EAST, consisting of approximately 59 hotel units located at 900 S Holladay, Seaside, Oregon 97138. The legal description of the real property is attached as **Exhibit 1.1** (the "Land"). Seller is also selling to Buyer certain personal property as described in Section 1.2.2 below. The Land, improvements and the FF&E (as defined below) is collectively referred to as the "Hotel".

1.2     With respect to the Hotel, the Purchase Price (as defined in section 3 below) includes the following (subject to the exclusions set forth in Section 2):

1.2.1   The Land on which the Hotel is situated together with the buildings and other improvements located on the Land.

1.2.2   The furniture, fixtures, and equipment (the "FF&E") owned by Seller used in the operation of the Hotel on hand at Closing (defined in section 12 below), AS IS WHERE IS, consisting primarily of guest room furniture, furnishings and electronics, lobby and public area furniture and furnishings, office computers and equipment, housekeeping and maintenance equipment and supplies, pool equipment and supplies, and the like.

1.2.3   All supplies and consumables on hand at the Hotel at Closing consisting primarily of sheets, pillow cases, towels, toilet paper, and cleaning supplies.

1.2.4.  All vendor or supplier contracts related to the operation of the Hotel, and all highway or other off-premises advertising signs advertising the Hotel, which will be assumed by Buyer. Buyer will be obligated to assume all contracts relating to the operation of the Hotel, unless Buyer agrees to pay any termination fee or liquidated damages incurred by Seller if the

Exhibit B

contract is not assumed.  Seller will provide Buyer with a list of contracts applicable to the operation of the Hotel during the Due Diligence Period (defined in Section 5).

1.2.5. All existing guest reservations, group bookings, or other commitments for future guest lodging relating to the Hotel existing as of Closing, which Buyer agrees to honor.

1.2.6 To the extent assignable, Seller's rights to telephone numbers solely servicing the Hotel.

1.3    Seller and Buyer agree to the following special provisions relating to this transaction:

1.3.1 The shuttle van currently located at the Hotel is owned by Shilo Management Corporation and not the Seller. The van is a 2004 GMC Safari van valued at $3,000. Buyer may elect to purchase the van from Shilo Management Corporation as a part of this transaction. The purchase price of the van is not a part of the Purchase Price.

1.3.2 At Closing, Buyer will be entitled to a credit of Seventy Five Thousand Dollars ($75,000) against the Purchase Price ("Buyer Closing Credit").

2.    **Purchase Price Exclusions.**  The Purchase Price for the Hotel EXCLUDES, and Buyer will obtain no interest in, any of the following:

2.1    The Shilo Inn® name, including all derivatives thereof ("Shilo Service Mark" or collectively the "Shilo Service Marks").

2.2    Any and all signage containing a Shilo Service Mark. Unless otherwise agreed to by the parties in writing after the execution of this PSA Buyer will, at Buyer's cost: (i) remove all signage from the interior and exterior of the Hotel containing a Shilo Service Mark; and (ii) remove all personal property containing a Shilo Service Mark; within thirty (30) days after Closing and make the same available to Seller, or, if Buyer elects to enter into an agreement with SFI (as defined in Section 4 below) to continue to operate the Hotel as a Shilo Inn, then Buyer will remove the signage and personal property referenced above and make it available to Seller within thirty (30) days after termination of such agreement. This provision will survive the Closing.  Seller shall have the right to inspect the Hotel, on 24-hour written notice, after the 30-day period to ensure all Shilo Service Marks have been fully removed.

2.3    Any brochures, soap, shampoo, ice buckets, faucet handles or other items of equipment, fixtures, consumables or supplies on which the Shilo Service Marks are printed or affixed. If Buyer elects to enter into an agreement with SFI to continue to operate the Hotel as a Shilo Inn after Closing, Buyer may continue to use such items of equipment, fixtures, consumables or supplies while that agreement is in effect.

Exhibit B

2.4     The Hotel property management system or software used by, or licensed to, Seller in connection with its operation of the Hotel.

2.5     All manuals, corporate records and other private Shilo Inn documents, emails, and related information.

2.6     Any of the data capture equipment, credit card processing machines, and any computer software to which the Seller has no transferable rights or which are tied to Shilo Inn systems and servers.

3.     **Purchase Price**. The purchase price for the Hotel is Three Million Seven Hundred Thousand Dollars ($3,700,000.00) ("Purchase Price"). The Purchase Price is firm, non-negotiable and is payable in U.S. currency at Closing. The Purchase Price will be allocated as follows:

| | | |
|---|---|---|
| Land | | $  900,000 |
| Improvements | | $2,675,000 |
| FF&E | | $  125,000 |
| | Total | $3,700,000 |

4.     **Assumption of Franchise Agreement**. On or before January 31, 2016, Buyer may elect to continue to operate the Hotel as a Shilo Inn on a month-to-month basis pursuant to an assumption of the existing franchise agreement (the "Assignment"). The Assignment will be a separate written agreement to be executed and delivered at Closing. The Assignment will provide that during the period after Closing, provided that Buyer maintains Shilo hotel standards of cleanliness and customer service and otherwise complies with the terms of the assignment and franchise agreement, Buyer may continue to use the Shilo Service Marks and an affiliate of Seller, Shilo Franchise International, LLC ("SFI") will continue to take reservations (through all SFI portals including telephone, website, and online booking services) for the Hotel while operated under the Shilo Inn name. The Assignment will also provide: (i) for no initiation or application fee; (ii) a monthly franchise fee equal to 5% of gross room revenue for up to 2 years, 6% of gross room revenue for years 3 and 4, and 7% of gross room revenue for years 5-10; (iii) for Buyer reimbursement of all commissions and booking fees incurred by SFI relating to bookings for the Hotel while the agreement is in effect; (iv) that it is terminable without penalty by either party on 30 days' prior written notice; and (iv) that if the period operating under the Shilo Inns brand extends beyond 3 months from Closing, a reasonable, agreed upon property improvement plan (PIP) will be implemented to assure that the Hotel continues to meet the Shilo Inn facility standards. If the parties are unable to agree to the terms of the Assignment, Buyer will immediately discontinue operating the Hotel as a Shilo Inn at Closing, and at Buyer's sole cost and expense will comply with removal of any signage and personal property bearing any Shilo Service Mark. Buyer understands and agrees that the failure to remove the items bearing a Shilo Service Mark if no use agreement exists with SFI will result in damage to SFI, and Buyer agrees to work in good faith to immediately remove such items. Buyer's removal of any signage bearing a Shilo Service Mark must be done in a commercially reasonable manner and Buyer and Seller will work together to create a punch list of "Shilo Inn" items that Seller wishes

Exhibit B

to salvage, in Seller's sole discretion, and which Buyer will remove at Buyer's cost by means to minimize any damage to the salvaged items.  Seller will have thirty (30) days from the date Buyer notifies Seller that the salvaged items (including both signage and miscellaneous personal property branded with Shilo Service Marks) are ready for pick-up to retrieve any such salvaged items from the Hotel, at Seller's cost. If Seller fails to pick up the salvaged items within the thirty (30) day period, they will be deemed abandoned and Buyer may discard them. The provisions in this section regarding the removal and retrieval of items bearing the Shilo Service Marks will survive Closing.

5.    Contingencies.
      5.1 1 Buyer Contingencies. The obligation of the Buyer to purchase the Hotel is subject to the fulfillment of each of the following conditions, which are for the benefit of the Buyer:

      5.1.1    Due Diligence.
      (a) Buyer will have a period ending on December 22, 2015 to conduct all of Buyer's due diligence on the Hotel ("Due Diligence Period").  During the Due Diligence Period Buyer will have the right to perform such tests, inspections, and feasibility studies on the Hotel as Buyer may deem necessary; provided, however, that Buyer will not conduct any environmental assessment that would require soils analysis, groundwater testing, or other studies commonly associated with a Phase II environmental site assessment without the prior written consent of Seller in each instance, which consent may be withheld or conditioned in Seller's sole discretion. Seller will, within five (5) business days after the execution of this Agreement, make available to Buyer information regarding the Hotel that Seller has in its possession or that Seller can reasonably obtain. Seller will also permit and, to the extent reasonably required by Buyer, assist Buyer in providing access to the Hotel in connection with Buyer's review of the Hotel. Such grant of access to the Hotel by Seller to Buyer will be very discreet and will minimize contact with the Hotel's staff, and will not disclose that the Hotel potentially may be sold to any third party.  Buyer agrees not to contact Seller's lender or any vendor of Seller without prior written consent of Seller, which may be withheld in Seller's sole discretion. Buyer will schedule and coordinate all inspections, including, without limitation, any environmental tests, with Seller and will give Seller at least two (2) business days prior written notice thereof. Seller will be entitled to have a representative present at all times during each such inspection. All costs and expenses of Buyer's tests, inspections, and studies must be paid by Buyer when due, regardless of whether this transaction closes. Buyer will indemnify, defend, and hold harmless Seller from and against any and all costs, losses, damages, expenses, liabilities, actions, liens, or claims arising from or related to any activities on or about the Hotel by Buyer or any agent, employee, contractor, or invitee of Buyer. This agreement to indemnify, defend, and hold harmless Seller will survive Closing or any termination of the Agreement.

      (b) If, by the expiration of the Due Diligence Period, Buyer has notified Seller in writing that Buyer does not wish to proceed, then this Agreement will terminate, whereupon the Earnest Money (as defined in Section 10 below) will be refunded to Buyer. This Agreement thereafter will be null and void, and neither party will have any obligation to the other, except as otherwise provided herein. If Buyer does not provide a timely notice of rejection, the due

Page 4. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

diligence contingency under this Section 5.1.1 will be deemed waived and this Agreement will continue to be binding on Buyer.

      5.1.2   Financing Contingency.

      (a) Buyer will have a period ending on February 8, 2016 to investigate financing and satisfy itself of Buyer's ability to obtain suitable financing for the purchase ("Financing Contingency Period"). If, by the expiration of the Financing Contingency Period, Buyer has not satisfied itself as to the availability of financing, Buyer may, by written notice to Seller ("Financing Failure Notice") elect to terminate this Agreement, whereupon the Earnest Money will be refunded to Buyer. This Agreement thereafter will be null and void, and neither party will have any obligation to the other, except as otherwise provided herein. Unless a Financing Failure Notice is given by Buyer prior to the expiration of the Financing Contingency Period, the financing contingency under this Section 5.1.2 will be deemed waived and this Agreement will be binding on Buyer.

      (b) If at the expiration of the Financing Contingency Period the Buyer has not provided a Financing Failure Notice, then and in that event the Earnest Money will become nonrefundable (except in the case of a breach of this Agreement by Seller or a title defect as provided for in Section 6) and be released to Seller without further instruction to Escrow Holder (or if Escrow Holder requires a signed release of Earnest Money then Buyer will within 24-hours of request sign it so that the Earnest Money can be released to Seller).

      5.2   Buyer's Closing Efforts. Within five (5) business days from the date of execution of this PSA, Buyer will provide Seller with a written disclosure of Buyer's proposed financing source(s), a copy of the fully completed and submitted loan application(s) to its lender(s), along with copies of all other documents and correspondence relating to Buyer's financing of a portion of the purchase price. Buyer will submit to Seller weekly (beginning with the first Friday after the expiration of 10 days after the execution of this PSA and on Friday of each following week through the expiration of the Financing Contingency Period) updates regarding the status of its financing application(s), and provide copies of correspondence with the lender regarding the status of loan approval.  Upon receipt of any written lending commitment, Buyer will provide Seller a copy.

      5.3 Seller's Contingency.  If at any time prior to the expiration of the Financing Contingency Period Buyer fails to make a Friday report described in Section 5.2 or has not, in the exercise of Seller's reasonable discretion, made sufficient progress towards obtaining a lending commitment, or is not proceeding with diligence to obtain such financing, Seller may by written notice to Buyer ("Seller's Termination Notice") elect to terminate this PSA, unless Buyer agrees to make the Earnest Money nonrefundable and released to the Seller without further instruction to Escrow Holder (or if Escrow Holder requires a signed release of Earnest Money then Buyer will within 24-hours of request sign it so that the Earnest Money can be released to Seller). If Buyer declines to make the Earnest Money nonrefundable and released to Seller, the Seller's Termination Notice will terminate the PSA, the Earnest Money will be refunded to

Exhibit B

Buyer, and neither party will have any further obligation to the other, except for those obligations which expressly survive a termination of this PSA.

6.   **Condition of Title/Insurance.**

6.1   Title Report. Seller will cause Title Company (as defined below) to furnish to Buyer a preliminary title report for the Land (the "Title Report"), together with copies of all underlying title documentation which are referred to as exceptions in the Title Report.  Not later than five (5) business days after delivery of the Title Report, Buyer will notify Seller and Escrow Holder in writing of any objections it may have to any title matters (other than the Permitted Exceptions, as defined below, which are deemed approved by Buyer under this PSA) which materially and adversely affect the Land in its current use.  Buyer's failure to notify Seller and Escrow Holder in writing within such time period of its disapproval of the condition of title of the Land as provided above shall constitute Buyer's unconditional and irrevocable approval of the title condition of the Land.   In the event Buyer provides such notification of title objection, Seller will have five (5) business days to notify Buyer of its intent to cure or cause the removal of any title objection. Seller may, but will not be obligated to, cure or cause the removal of a title objection. If Seller is unable or unwilling to cure or cause the removal of a title objection of Buyer, Buyer may, by making a written election within five (5) business days of Seller's notice, elect to waive the title objection and proceed to Closing, or notify Seller that it elects to terminate the PSA, whereupon the Earnest Money will be refunded to Buyer and neither party will have any further obligation to the other, except as otherwise provided in this PSA. If Buyer fails to make an election based on Seller's notice within the five business day period, Buyer will be deemed to have waived the title objection and elected to proceed to Closing. The following title matters are hereby approved by Buyer and will be deemed permitted title exceptions at Closing (collectively, the "Permitted Exceptions"):

(a)   Real or personal property tax liens and assessments that will be paid or as applicable prorated at Closing;

(b)   All preprinted or standard exceptions on the Title Report;

(c)   Matters (including matters shown in the Title Report) which are approved or deemed approved by Buyer as provided in this Section 6;

(d)   Any matters created or caused by Buyer (including any matters related to the loan obtained by Buyer to acquire the Hotel); and

(e)   Such other matters, if any, as may be approved in writing by Buyer.

Notwithstanding the foregoing, Seller, at its sole cost, agrees to remove any trust deed liens, UCC liens, mechanic's liens, judgment liens and all other financial encumbrances created or caused by Seller and attaching to the Land or the FFE. Seller will also provide the Title Company with an Owner's Affidavit on a form acceptable to Title Company to enable Title Company to remove the standard exceptions for parties in possession and mechanic's liens for work performed during the ninety (90) day period preceding the Closing.

6.2 Title Policy. At Closing, Title Company will cause to be issued to Buyer a standard form owner's policy of title insurance with respect to the Land (the "Title Policy") dated as of

Page 6. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

the date of Closing Date, insuring title to the Land vested in Buyer subject to the Permitted Exceptions, with liability in an amount equal to the value of the Land and improvements (as determined by Seller in good faith). If Buyer desires any endorsements to the Title Policy or an extended ALTA policy of title insurance, Buyer will pay the entire cost of such endorsements and the increased cost of the extended ALTA Title Policy over the cost of the Title Policy and the cost of any survey prepared to obtain an extended ALTA Title Policy, provided that the issuance of any endorsement or an extended ALTA policy will not be a condition to Buyer's obligations hereunder.

7.    **Seller Representations and Warranties**. Seller represents, to the best of its knowledge, that:

7.1 Financial Information. All financial information Seller provided to Buyer, or may provide to Buyer through Closing, is materially complete, fairly represents the results of operations of the Hotel for the periods specified, and has been prepared in accordance with the books of account and records of Seller kept in the ordinary course of business.

7.2 No Condemnation. There is no pending or threatened condemnation or similar proceeding affecting the Hotel nor is any such proceeding contemplated by any governmental authority.

7.3 No Notice of Violation. Seller has not received notice from any municipal, county, state or federal governmental agency that the Hotel is in violation of any laws, ordinances, statutes or regulations.

7.4 No Litigation. There is no litigation, arbitration, or administrative hearing before any governmental authority concerning or affecting the Hotel, or any part thereof, nor is any such proceeding threatened as of the date hereof.

7.5 No Construction Liens. Seller has not performed, or caused to be performed, any work on the Hotel, or any part thereof, that will not be paid for that could cause a construction lien to be filed against the Hotel.

7.6 No Breach. Execution and consummation of this PSA, and the execution and delivery of the documents contemplated herein, will not be a breach of any other contract affecting the subject matter of this PSA.

7.7 Seller Not a Foreign Person. Seller is not a foreign national within the meaning of Section 1445 of the Internal Revenue Code of 1986. The Seller will sign an affidavit to this effect to be delivered to Buyer at Closing, to include Seller's tax identification number.

As used in this section, Seller's knowledge means the actual personal knowledge of Mark Hemstreet, without a duty to inquire or investigate.

Page 7. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

8. <u>Hotel Sold As Is</u>.

    8.1    <u>No Warranty</u>. Buyer acknowledges that Buyer has assessed, or has had the opportunity to assess, the size, configuration, utility service, environmentally sensitive areas, means of access, permitted uses, status of title, value, condition, feasibility, and all other material aspects of the Hotel. Except as specifically stated in Section 7, Buyer is not relying on, nor has Buyer been influenced by, any statement or representation of Seller or any agent or representative of Seller regarding any of such items. Except for any actionable breaches of Seller's representations and warranties described in Section 7, Buyer's acceptance of the Hotel will be evidenced solely by the closing of this transaction and without any other act or confirmation by Buyer. Buyer does not have the option to close this transaction without accepting the Hotel in its then current condition, and Buyer acknowledges that Buyer is acquiring the Hotel "AS IS, WHERE IS" in its current condition existing as of the date of Closing, without any representation or warranty of any kind or nature by Seller except as set forth in Section 7. Seller makes no representation or warranty, express or implied, including any warranty of merchantability or fitness for a particular purpose, with the respect to the FF&E, all of which is sold AS IS, WHERE IS, WITH ALL FAULTS.

    8.2    <u>Release</u>. As part of the consideration for this PSA, Buyer agrees that except for any breach by Seller of an express representation or warranty set forth in Section 7 of this PSA, Seller has no liability, and Buyer hereby waives any claims and releases Seller for all liability, for any title, physical condition, or any other aspect of the Hotel, whether direct or indirect, absolute or contingent, foreseen or unforeseen, and known or unknown. The waiver and release extends to Seller and Seller's affiliates, successors, members, officers, employees, and agents, and their respective heirs, successors, and assigns. Without limiting the generality of the foregoing, Buyer waives all rights to contribution, offsets, and damages that in any manner relate to the compliance of the Hotel with any law or regulation applicable thereto, including, without limitation, the Americans with Disabilities Act, 42 USC §§12101–12213; the Fair Housing Act, 42 USC §§3601–3631; the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC §§9601–9675; the Resource Conservation and Recovery Act, 42 USC §§6901–6992k; the Clean Water Act, 33 USC §§1251–1387; the Safe Drinking Water Act, 42 USC §§300f–300j-26; the Hazardous Materials Transportation Act, 49 USC §§5101–5128; the Toxic Substances Control Act, 15 USC §§2601–2692; and any and all other federal, state, and local personal disabilities and environmental laws or regulations.

9.    <u>Risk of Loss and Condemnation</u>. If after the Effective Date but prior to Closing either any portion of the Land is taken pursuant to eminent domain proceedings, or any of the improvements are damaged or destroyed by any casualty, the transaction will proceed to Closing and Seller will not have any obligation to repair or replace any such damage or destruction, but Seller will be required to give Buyer written notice of the same (the "Casualty/Condemnation Notice") within three (3) business days after Seller learns of the same. Seller will also deliver and assign to Buyer, upon consummation of the transaction contemplated by this PSA (except to the extent any condemnation proceeds or insurance proceeds are attributable to lost rents or revenues or other items applicable to any period prior to the Closing), all claims of Seller respecting any condemnation or casualty insurance coverage,

Exhibit B

as applicable, and all condemnation proceeds, or proceeds from any such casualty insurance received by Seller on account of any casualty (except to the extent required for collection costs or repairs by Seller prior to the date of Closing), as applicable. There will be no reduction of the Purchase Price on account of any casualty or condemnation (except that in connection with a casualty covered by insurance, Buyer will be credited with the lesser of the remaining cost to repair the damage or destruction caused by such casualty or the amount of the deductible under Seller's casualty insurance policy [except to the extent an amount equal to or greater than such deductible was expended by Seller to commence repair of the resulting damage or safeguard the Hotel from further damage and is not covered by any applicable casualty insurance]). Notwithstanding the above, in the event the condemnation award or the cost of repair of damage to the Hotel on account of a casualty, as applicable, will exceed ten percent (10%) of the Purchase Price, Buyer may, at its option, terminate this PSA by notice to Seller, given on or before five (5) business days after the delivery of the Casualty/Condemnation Notice, in which event the Earnest Money will be returned to Buyer and neither party will have any further obligation under this PSA except for those obligations which expressly survive a termination of this PSA.

10.    **Escrow and Earnest Money.** Escrow has been opened with Ticor Title Insurance Company, 111 SW Columbia, Suite 1000, Portland, Oregon 97201 Attn: Candice Weischedel ("Escrow Holder") and Escrow Holder and its affiliate title company(ies) will administer Closing ("Title Company"). Buyer has deposited Fifty Thousand Dollars ($50,000.00) ("Earnest Money") with the Title Company. Buyer will receive credit for the Earnest Money on the Purchase Price at Closing.

11.    **Default.** If the sale of the Hotel is not consummated due to any default or breach by Buyer or for any other reason other than a material default by Seller or the failure of any of the conditions set forth herein, the Earnest Money will constitute liquidated damages and the Seller agrees this is Seller's sole and exclusive remedy, it being agreed between the parties hereto that the actual damages to Seller in the event of such failure are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate thereof. BY SIGNING THIS PSA THE PARTIES ACKNOWLEDGE THAT THE EARNEST MONEY HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLER'S DAMAGES AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER, AT LAW OR IN EQUITY, IN THE EVENT OF A FAILURE BY BUYER TO CLOSE WHEN OBLIGATED TO DO SO UNDER THIS PSA. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY.

If the sale of the Hotel is not consummated due to any material default or breach by Seller, Buyer may terminate this PSA and will be entitled to a return of the Earnest Money, but in no event will there be a right to sue for specific performance, damages, or other similar legal or equitable claim.

12.    **Closing.** Closing will take place through Escrow Holder's title office on or before March 7, 2016 (the "Closing" or "Closing Date").

Page 9. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

12.1   At Closing, Seller will be responsible for:  fees of its own legal counsel; the premium for the Title Policy; recording fees, if any, relating to the release of Seller's mortgage; the facilitator's fee referred to in Section 14.13 and one-half of escrow fees. At Closing, Buyer will be responsible for: fees of its own legal counsel; all due diligence costs; the survey, if one is required; the premium of any extended title insurance and any endorsements; recording fees, if any, relating to the deed; any transfer or excise tax relating to the transaction; and one-half of escrow fees.  Also at Closing, Buyer will be entitled to the Buyer's Closing Credit (see Section 1.3.2)

12.2   At Closing, Seller will transfer title to the Land to Buyer by Warranty Deed, free and clear of liens and encumbrances, save and except Permitted Exceptions, the new financing that may be obtained by Buyer, if applicable, the current year's property taxes prorated to Closing, and any liens or encumbrances created by or through Buyer.

12.3   At Closing, Seller will transfer title to the FF&E to Buyer by bill of sale "AS IS".

12.4   Buyer will obtain, at Buyer's own expense, property and liability insurance at or before Closing, insuring Buyer's interest in the Hotel as of the Closing Date.

12.5   At Closing, prorations and the closing procedure relating to Hotel operations will take place as set forth on **Exhibit 12.5**.

12.6   **Seller's Closing Obligations.**  At the Closing, Seller will deliver the following or cause the following to be delivered to Escrow Holder or to Buyer, as indicated:

12.6.1   To Buyer, possession of the Hotel, including, without limitation, all keys, codes and passwords necessary to fully operate the Hotel;

12.6.2   To Escrow Holder, for delivery to Buyer, the following documents:

a.   A Warranty Deed ("Deed"), in a commercially reasonable form provided by the Title Company that is mutually acceptable to Buyer and Seller, conveying to Buyer title to the Land, subject only to the Permitted Exceptions, executed by Seller and acknowledged;

b.   A Bill of Sale ("Bill of Sale") executed by Seller conveying to Buyer the FF&E;

c.   An affidavit of Seller conforming with the requirements of Section 1445 of the Internal Revenue Code, the Patriot Act, or any other law, statute or regulation affecting the Land or the transactions contemplated by this PSA;

d.   An ALTA Statement, on Escrow Agent's standard form, if required, executed by Seller;

Exhibit B

e.        Such other documents and information as the Title Company reasonably requires to issue the Title Policy with any requested endorsements;

f.        Escrow Holder's escrow instructions with Escrow Holder's commercially reasonable standard provisions and requiring Escrow Holder to comply with the provisions of this PSA and record and deliver the documents set forth in, and as contemplated by, this PSA, signed by Seller;

g.        A Closing Statement executed by Seller;

h.        The Assignment, if Buyer elects to operate the Hotel as a Shilo Inn after Closing, signed by an affiliate of Seller;

i.        An Assignment and Assumption of Contracts, signed by Seller; and

j.        A certificate of title for the van referenced in Section 1.3.1, if Buyer elects to purchase, endorsed by an affiliate of Seller; and

k.        A Management Agreement if Buyer elects to contract with Shilo Management Corporation to continue managing the Hotel.

12.7    **Buyer's Closing Obligations**.  At the Closing, Buyer will deliver to Escrow Holder:

12.7.1    By wire transfer, the Purchase Price (subject to any credit for the Earnest Money deposited and any credit from prorations);

12.7.2    Escrow Holder's escrow instructions with Escrow Holder's commercially reasonable standard provisions and requiring Escrow Holder to comply with the provisions of this PSA and record and deliver the documents set forth in, and as contemplated by, this PSA, signed by Buyer;

12.7.3    A closing statement setting forth all of the payments and prorations to be made in the consummation of the sale hereunder in accordance with the provisions of this PSA executed by Buyer;

12.7.4    The Assignment, if Buyer elects to operate the Hotel as a Shilo Inn after Closing, signed by Buyer; and

12.7.5    An Assignment and Assumption of Contracts, signed by Buyer; and

12.7.6    A Management Agreement, signed by Buyer, if Buyer elects to contract with Shilo Management Corporation to continue managing the Hotel.

13.    **Indemnity.**  Each of the Seller and the Buyer will indemnify and defend the other party, to include attorneys' fees and costs, for any and all claims, costs, losses or damages, whether in contract or in tort, arising or alleged to arise during the period for which each party is responsible.

Page 11. Shilo Inn Seaside East Purchase and Sales Agreement

13.1     The Seller will be responsible for all claims, costs, losses or damages incurred with respect to the Hotel prior to the date of Closing.  Without limiting the generality of the foregoing, Seller will be responsible for all wages, fringe benefits, and other employment costs of all Hotel employees to the date of Closing.  Seller, at its sole cost, will terminate the existing management agreement for the continuing management of the Hotel with Shilo Management Corporation at Closing (unless Buyer elects to assume the agreement).

13.2     Buyer will be responsible for all claims, costs, losses or damages incurred on or after the date of Closing.  Buyer will accept and pay for any goods and services necessary for the reasonable operation of the Hotel, which were ordered prior to Closing but delivered or rendered after Closing.  Seller agrees to minimize such orders and to coordinate such orders with Buyer as reasonably possible.  In addition, Buyer will be solely responsible for any lien, claim or amount related to any third party vendor retained by Buyer or Buyer's representative related to this PSA whether or not Closing occurs.

14.     **Additional Covenants of the Parties.**

14.1     Pending Closing, Seller will operate the Hotel in the ordinary course of business and will maintain reasonable levels of inventory.

14.2     This PSA is binding upon and inures to the benefit of the parties' heirs, successors, and permitted assigns.  Buyer may, upon written notice to Seller, assign its rights under this PSA, without the prior written consent of Seller, to an affiliated entity which is owned or controlled by Buyer. Except as provided for in the preceding sentence, Buyer may not assign or otherwise transfer this PSA or any interest herein, voluntarily, involuntarily, or by operation of law, without the prior written consent of Seller in each instance.

14.3     The covenants of each party contained in this PSA will survive Closing and will not merge into any document delivered at Closing.

14.4     This PSA constitutes the entire agreement of the parties with respect to the sale of the Hotel and supersedes and replaces all written and oral agreements previously made or existing between the parties, including any letter of intent.

14.5     If any provision of this PSA is declared unenforceable by a court having jurisdiction, the provision is ineffective only to the extent declared unenforceable. The remainder of the provision and all other provisions of this PSA will continue in full force and effect, so long as the basic purpose of the PSA can be fulfilled.

14.6     Any notices to Buyer and Seller will be sent to the following addresses:

    To Buyer:
    Ganesh Sonpatki

Page 12. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

415 SW Montgomery St
Portland OR 97201

To Seller:
Shilo Inn, Seaside East, LLC
Attn: Legal Department
11600 S.W. Shilo Lane
Portland, Oregon 97225

Notices by any party pursuant to this PSA may be made by hand delivery; certified or registered mail (with return receipt); private carrier (such as, for example, Federal Express) with delivery confirmation. Notices by hand delivery will be deemed received when delivered to the addressee's address; notices by certified or registered mail will be deemed received forty-eight (48) hours after mailing; and notices sent by private carrier will be deemed received when actually delivered.

14.7    Unless otherwise provided herein, where any notice by any party is to be given by a specified date, or on or within a stated number of days after a stated event, the notice will be given on or before 5:00 P.M. Pacific Standard Time on the required date.  If the required date is a Saturday, Sunday, or not a regular business day, the notice will be given not later than the next business day. All references to 'business days' in this PSA will mean a day other than a Saturday, Sunday or a federal banking holiday.

14.8    Buyer agrees to keep confidential the fact that it is purchasing the Hotel as well as any information or data received or discovered in its review and inspections regarding the Hotel.

14.9    Each of the parties hereto have been represented by legal counsel of their choice in respect to this transaction, and each of the parties will be responsible for their own attorney fees incurred in negotiating this PSA.  This PSA has been negotiated with each party having the opportunity to consult with legal counsel and will be construed without regard to which party drafted all or any part of this PSA. The captions of the sections and paragraphs in this PSA are used solely for convenience and are not intended to limit or otherwise modify the provisions of this PSA.

14.10   Failure of either party at any time to require performance of any provision of this PSA will not limit such party's right to enforce such provision, nor will any waiver of any breach of any provision of this PSA constitute a waiver of any succeeding breach of such provision or waiver of such provision itself.

14.11   This PSA may be executed simultaneously or in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same contract.

Exhibit B

Either party may rely on facsimile or digitally transmitted copies of this PSA to the same extent as the originals.

14.12   The parties acknowledge that this PSA has been negotiated and is entered into in the State of Oregon.  The parties expressly agree that this PSA will be governed by, interpreted under, and construed and enforced in accordance with the laws of the State of Oregon.

14.13  Seller will pay a facilitator's fee of One Hundred Fifteen Thousand Dollars ($115,000) at the Closing of the transaction to Clear Wave Enterprises, LLC. Each party warrants to the other party that no broker or agent was consulted or engaged in connection with this transaction, and each party will indemnify, defend, and hold harmless the other from and against all claims, losses, and liabilities made or imposed for any commission to any broker or agent (other than the facilitator's fee referenced above) and arising out of the actions of such party.

14.14    Each party will cooperate with the other in a property exchange under IRC §1031 in connection with this sale as long as in doing so it incurs no additional liability or expense, it is not required to hold title to any other property, the Closing Date is not affected, and the entire amount owed to Seller hereunder is paid in the manner stated in this PSA. Neither party will have any responsibility for the ultimate characterization of this transaction for the other party's tax purposes. This sale is not conditioned on and may not be rescinded as a result of such characterization or either party's ability to effect an exchange.

14.15    During the Due Diligence Period, Seller will advise Buyer of all supplier or vendor contracts involving the provision of supplies or services to the Hotel (including billboard or advertising contracts relating solely to the Hotel) and provide copies of the same where available. In the event certain services are provided to Hotel through a multi-property agreement with the Shilo Inn group of hotels, Seller will use commercially reasonable efforts to cause the vendor to separate the Hotel from the multi-property agreement and make the service available on a stand-alone basis to Hotel.

14.16    If any arbitration, suit, or action is instituted to interpret or enforce the provisions of this PSA, to rescind this PSA, or otherwise with respect to the subject matter of this PSA, the party prevailing on an issue will be entitled to recover with respect to such issue, in addition to costs, reasonable attorney fees incurred in the preparation, prosecution, or defense of such arbitration, suit, or action as determined by the arbitrator or trial court, and, if any appeal is taken from such decision, reasonable attorney fees as determined on appeal.

14.17    All baggage of guests who are still in the Hotel on the Closing Date, which has been checked with or left in the care of Seller will be inventoried, sealed, and tagged jointly by Seller and Buyer on the Closing Date. From and after the Closing Date, Buyer will save, defend, indemnify and hold harmless Seller and its agents, employees, affiliates and representatives from and against any claims, liabilities, losses, damages, costs and expenses in connection with such baggage arising out of the acts of omissions of Buyer or its affiliates (or any of their

Page 14. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

employees or agents) from and after the Closing Date. From and after the Closing Date, Seller will indemnify and defend Buyer and its agents, employees, affiliates and representatives from and against any claims, liabilities, losses, damages, costs and expenses in connection with such baggage arising out of the acts of omissions of Seller or its affiliates (or any of their employees or agents) prior to the Closing Date.

14.18   At any time after the expiration of the Financing Contingency Period (assuming Buyer has not elected to terminate the PSA), but not before, upon request from Buyer, Seller will cause Shilo Management Corporation to consent and allow Buyer to contact and negotiate with the existing Hotel manager and any other "key staff" as identified by Buyer to become employed by Buyer at the Hotel after the Closing.  Seller encourages the Buyer to consider, at Buyer's sole discretion and risk, retaining the existing, loyal Shilo staff currently working at the Hotel.

14.19   Time is of the essence for each and every provision of this PSA.

14.20   By providing an unexecuted copy of this PSA to any person, neither party is deemed to have made an offer to sell or purchase or otherwise indicated its willingness to enter into any transaction with respect to the Hotel, and this PSA will not be binding on any party unless and until it has been fully executed and delivered by Seller and Buyer.

14.21   On or before January 31, 2016, Buyer may elect (if an election is also made to assume the franchise agreement), by giving notice to Seller, to have Shilo Management Corporation continue to operate the Hotel as its manager. In such event Buyer and Shilo Management Corporation will make a good faith effort to enter into a Management Agreement for operation of the Hotel post-closing. Any such agreement will provide for a management fee of four percent (4%) of gross Hotel revenue, and be cancelable by either party without penalty on thirty (30) days prior written notice.

SELLER:        **Shilo Inn, Seaside East, LLC**
               **By: Shilo Seaside East Corp**
               **its manager**

               By: _____
                       Mark Hemstreet, Secretary

BUYER:

               _____
               Ganesh Sonpatki

Page 15. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

Referenced Exhibits:

Exhibit 1.1          Legal Description of Land
Exhibit 12.5         Proration and Closing Procedure

## Exhibit 1.1

### LEGAL DESCRIPTION:

PARCEL NO. 1:
Beginning at a point in the county road leading from Skipanon Landing to Seaside 11.48 chains
West of the quarter Section post on the East line of Section 21, Township 6 North, Range 10
West of the Willamette Meridian; thence South along the centerline of said county road a
distance of 558.43 feet; thence West to the West line of said county road to a point which is the
Northeast corner of that certain tract of real estate conveyed by A. M. Smith and Anna F. Smith
to Nettie C. Allen and N. C. Allen by Deed recorded in Book 104, page 637, Clatsop County
Record, which point is the point of beginning of the tract of land hereby conveyed; thence West
along the North line of said N. C. Allen and Nettie Allen tract a distance of 100 feet; thence
North and parallel to said county road a distance of 50 feet; thence East along the South line of
that certain tract conveyed by A. M. Smith and Anna F. Smith to Annie Plummer by Deed
recorded in Book 108, page 174, Clatsop County Records, to the West line of said county road;
thence South along the West line of said county road to said Northeast corner of said Nettie C.
Allen and N. C. Allen tract, the point of beginning of the land herein conveyed, in Section 21,
Township 6 North, Range 10 West, Willamette Meridian, in the City of Seaside, County of
Clatsop, State of Oregon.

PARCEL NO. 2:
That part of the Elizabeth Lattie Donation Land Claim described as follows:
Beginning at a point in the county road leading from Skipanon Landing to Seaside 11.28 chains
West of the quarter Section post on the East line of Section 21, Township 6 North, Range 10
West, Willamette Meridian (run at angle to the East line of said Section 21); thence South 2-

Page 16. Shilo Inn Seaside East Purchase and Sales Agreement

Exhibit B

1/2° West 558.43 feet; thence West to the West line of said county road which is the Northeast corner of the tract of land described and conveyed herein; thence West 5.87 chains to low water mark of the Necanicum River; thence South along low water mark of said river 108 feet to the Northwest corner of tract of land conveyed by A. M. Smith to George Lapay; thence East along the North line of said tract conveyed by A. M. Smith to George Lapay to the Northeast corner thereof, which point is a point on the West line of said county road 108 feet South of the point of beginning for the description of the tract herein conveyed; thence North along the West line of said county road a distance of 108 feet to the place of beginning, the said tract being 108 feet North and South and running from the county road to low water mark of the Necanicum River, and adjoining said George Lapay tract on the North, the said George Lapay tract being described in that certain Deed recorded in Book 95, page 450, Clatsop County Records, situated in the City of Seaside, County of Clatsop, State of Oregon.

## Exhibit 12.5
### Proration and Closing Procedure

1.1    Adjustments, Allocations and Prorations.  The following provisions will govern the adjustments and prorations that will be made at Closing and the allocation of income and expenses from the Hotel between Seller and Buyer.  Except as expressly provided to the contrary in this Section 1.1, all items of revenue, cost and expense of the Hotel, with respect to the period prior to 11:59 P.M. (the "Cut-Off Time") on the day prior to the Closing Date, will be for the account of Seller and all items of revenue, cost and expense of the Hotel, with respect to the period after the Cut-Off Time on the day prior to the Closing Date, will be for the account of Buyer.  Any net adjustment in favor of Buyer will be credited against the Purchase Price at the Closing.  Any net adjustment in favor of Seller will be paid in cash or cash equivalent at the Closing by Buyer to Seller.

1.1.1    Real Property Taxes, Personal Property Taxes, Impositions and Other Assessments.  Real property taxes, personal property taxes, impositions, and other assessments imposed upon or assessed against the Hotel will be prorated as of the Closing Date. Such proration will be done in accordance with the following provisions:

(a)    Allocation of Real Property Taxes, Personal Property Taxes, Impositions and Other Assessments.  With respect to the Hotel, Seller will be responsible for all real property taxes, personal property taxes, regardless of when payable and when billed, impositions and other assessments that are attributable to the period prior to the Closing Date, and Buyer will be responsible for all real property taxes, personal property taxes, regardless of when payable and when billed, impositions and other assessments that are attributable to the period from and after the Closing Date.

(b)    Adjustment of Tax Rate or Assessment.  If the real property tax rate, personal property tax rate or any assessment has not been set for the fiscal year in which the Closing occurs, then the proration of such real property tax, personal property

Exhibit B

tax or assessment will be based upon the rate of the assessment for the preceding fiscal year for such tax or assessment which has not been set for the fiscal year in which the Closing occurs, and such proration will be adjusted between Seller and Buyer upon presentation of written evidence of the amount of the actual taxes.  Any returns due to outstanding real property tax appeals initiated by Seller will be Seller's sole property and must be immediately remitted to Seller.  In addition, any tax appeals by Seller for any time period prior to Closing will belong solely to Seller.

       1.1.2       Hotel Reservations and Revenues.

       (a)       Reservations.  Buyer will honor (and will cause its manager to honor) all reservations at the Hotel that are made by Seller in the ordinary course of business on or prior to the Closing Date and pertaining to periods on or after the Closing Date.  Any down payments and advance deposits that are (i) received by Seller prior to the Closing Date; and (ii) made with respect to confirmed reservations for dates on or after the Closing Date, will be credited at Closing to Buyer.

       (b)       Guest Revenues.  Revenues from guest rooms in the Hotel occupied on the night containing the Cut-Off Time, including any sales taxes, room taxes and other taxes charged to guests in such rooms, all telephone, facsimile and data communications, in-room movie, laundry, and other service charges allocated to such rooms with respect to the night containing the Cut-Off Time will be divided evenly between Seller and Buyer.  All other revenues will be allocated based on whether the same accrued before or after the Cut-Off Time and Seller and Buyer will separately record sales occurring before and after the Cut-Off Time.

       1.1.3       Petty Cash and Cash on Hand.  The aggregate amount of petty cash and cash on hand at the Hotel as of the Closing Date will be referred to as the "Aggregate Cash Amount."  The Aggregate Cash Amount will belong to Buyer; provided, however, that Seller will receive a credit for the same at Closing.  Buyer and Seller will have representatives that count such cash together on the morning of the Closing Date.  All transferable deposits of Seller made for utilities, maintenance or service contracts, licenses, or otherwise, with respect to the Hotel will be credited to Seller at Closing.

       1.1.4       Hotel Receivables.  All receivables existing as of the Closing Date will remain the property of Seller.  Buyer will remit the receivables to Seller as and when received (for example, a guest group that stays before Closing, but sends payment to the Hotel post-closing).  Buyer will have the absolute and unconditional obligation to immediately forward to Seller any funds received by Buyer after Closing representing any revenues for guests stays or rebates earned on or prior to Closing.

       1.1.5       Operational Taxes.  The parties acknowledge that certain taxes accrue and are payable to the various governmental authorities by any business entity operating a hotel and its related facilities.  Included in those taxes may be business and occupation taxes, retail sales and use taxes, gross receipts taxes, and other special lodging or hotel taxes.  For purpose of this PSA, all of such taxes (expressly excluding taxes and

Exhibit B

assessments covered by Section 1.1.1, corporate franchise taxes, and federal, state, and local income taxes) (hereinafter referred to as "Operational Taxes") will be allocated between Seller and Buyer such that those attributable to the period prior to the Cut-Off Time will be allocable to Seller and those attributable to the period from and after the Cut-Off Time will be allocable to Buyer (with the attribution of such taxes hereunder to be done in a manner consistent with the attribution under this PSA of the applicable revenues on which such taxes may be based). Buyer will receive a credit for any Operational Taxes attributable to the period prior to the Cut-Off Time which Seller has not paid and which Buyer is obligated to pay.  Except for the Operational Taxes for which Buyer has received a credit under this Section 1.1.5, Seller will be responsible for payment of the Operational Taxes with respect to the period prior to the Cut-Off Time, and Buyer will be solely responsible for payment of such Operational Taxes with respect to the period from and after the Cut-Off Time.  Seller will apply for a tax clearance certificate with respect to the operation of the Improvements (to be issued by Closing) through the Closing Date.

   1.1.6  Wages and Other Employee Compensation.  Seller will terminate all of the Hotel's employees effective as of the Closing Date.  Seller will pay to all of the Hotel's employees the wages, salaries, benefits, accrued and unused vacation pay, accrued and unused sick pay, and all other employment related expenses, including payroll taxes (collectively, "Employee Compensation") payable to them as of the Closing Date.  Seller will be solely responsible for all Employee Compensation, which accrues on or before the Closing Date. Seller will indemnify and hold Buyer harmless for, from and against any claim by any employee for Seller's failure to pay (a) any severance payment, if any, due such employee, regardless of the period to which the severance entitlement applies, and (b) Employee Compensation which accrues on or before the Closing Date, and Buyer will indemnify, hold harmless and defend Seller for similar amounts for which Buyer or Buyer's agents are responsible on or after Closing Date.

   1.1.7  Permits; Contracts; Rebates.  With respect to the Hotel, permit and license fees of assignable permits and licenses, if any, will be prorated as of the Closing Date.  Payments due under any service agreements and equipment leases, if any and provided Buyer assumes same, will be prorated as of the Closing Date.

   1.1.8  Other Hotel Operating Expenses.  With respect to the Hotel, operating expenses and utility charges (subject to this Section 1.1.8 and Section 1.1.10 below) and expenses under any reciprocal easement, shared use, or operating agreements (if any) with respect to private roadways, parking, recreational, or other facilities (to the extent any such expenses or charges are not allocated under the foregoing provisions of this Section 1.1) will be prorated between Seller and Buyer by allocating to Seller those expenses attributable to the period prior to the Closing Date, and allocating to Buyer those expenses attributable to the period from and after the Closing Date.  To the extent that the amount of actual consumption of any utility services is not determined prior to the Closing Date, as provided in Section 1.1.10 below, a proration will be made at Closing based on the last available reading, and post-closing adjustments between Buyer and Seller will be made as part of the post-Closing reconciliation

Exhibit B

pursuant to Section 1.1.11, which obligation will survive the Closing and not be merged therein. Any tour agents' and travel agents' commissions will be prorated as of the Closing Date.

        1.1.9      Payment of Credited Amounts.  In any case in which Buyer receives a credit at Closing on account of any obligation of Seller hereunder, Seller will have no further liability for such obligation to the extent of the credit so given, and Buyer will pay and discharge the same, together with any penalties, fines, fees, interest and other charges thereon or related thereto imposed by third parties or by law in connection with Buyer's non-payment of such items, and any legal fees incurred by Seller to enforce the provisions of this Section 1.1.9.

        1.1.10      Items for Which There Will Not be a Proration.  Seller and Buyer agree that (a) none of the insurance policies relating to the Hotel will be assigned to Buyer, and Buyer will be responsible for arranging for its own insurance as of the Closing Date; and (b) utilities, including telephone, electricity, water and gas, will be read on the Closing Date and Buyer will be responsible for all the necessary actions needed to arrange for utilities (including telecommunications such as television and internet) to be transferred to the name of Buyer beginning 12:01 A.M. on the Closing Date, including the posting of any required deposits and cooperation with Seller to get Seller's return of any deposits Seller current has at Closing. Accordingly, there will be no prorations for insurance or utilities, unless a meter reading is unavailable for any particular utility, then such utility will be prorated in the manner provided in Section 1.1.8 above.  To the extent reasonably possible, Buyer and Seller will cooperate to arrange for utility and other service providers to separately bill each party for their respective periods of ownership, in which event no credit and no proration will be necessary.  Seller will be entitled to receive and be returned any deposits Seller may have with any utility companies, or will receive a credit at Closing from Buyer to the extent such deposits may be transferred to Buyer's account.

        1.1.11      Closing Statement; Post-Closing Reconciliation.  The prorations and credits hereunder at the Closing will be made based on a closing statement (the "Closing Statement") prepared by Escrow Holder and adjusted as aforesaid and approved in writing by the parties (which approval will not be unreasonably withheld) prior to the Closing, based on actual figures to the extent available provided by the parties to the Escrow Holder. If any of the prorations cannot be calculated based on actual figures, then they will be calculated based on the parties' good faith estimates, which will be subject to Seller's and Buyer's reasonable approval.  As soon as reasonably practicable after the Closing but in no event later than thirty (30) days after the Closing, Seller and Buyer, acting reasonably and in good faith, will reconcile between themselves the amounts to be prorated pursuant to this PSA, using any updated information with respect to such matters then available.  Each party will provide the other reasonable access to the books, records, computer runs and other documents relating to the Hotel which contain information relevant to completing the final reconciliation.  If the final reconciliation of prorations, as agreed to between Seller and Buyer, shows any amount due from Seller to Buyer, or vice versa, the party owing such amount will pay such amount (in

Exhibit B

immediately available funds) within five (5) Business Days after reaching agreement on the final reconciliation.

        1.1.12      <u>Survival of Section 1.1</u>. The obligations and rights of the parties under this <u>Exhibit 12.5</u> will survive the Closing.

Exhibit B

**FIRST AMENDMENT TO**
**SHILO INN SEASIDE EAST**
**PURCHASE AND SALES AGREEMENT**

SELLER:          Shilo Inn, Seaside East, LLC, an Oregon limited liability company

PURCHASER:    Ganesh Sonpatki

## RECITALS

A.      Purchaser and Seller are parties to that certain Shilo Inn Seaside East Purchase and Sales Agreement dated effective December 11, 2015 ("Sales Agreement") in respect of the real property commonly known as the Shilo Inn located at 900 S. Holladay, Seaside, Oregon 97138, which Property is more particularly described in the Sales Agreement.

B.      Purchaser and Seller wish to amend the Sales Agreement in respect of the Financing Contingency Period.  All capitalized terms used in this First Amendment that are not otherwise defined will have the same meanings given them in the Sales Agreement.

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby affirmed, Purchaser and Seller agree as follows:

## AGREEMENTS

1.      **Extension of Financing Contingency Period.**     Section 5.1.2(a) of the Sales Agreement is hereby amended such that Financing Contingency Period is extended to and shall end on February 15, 2016.

2.      **No Other Modification**.   Except as specifically set forth herein, the Sales Agreement is unmodified and is hereby ratified and remains in full force and effect.

3.      **Counterparts: Electronic Signatures**.   This First Amendment may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which, when taken together shall constitute one and the same instrument, with the same effect as if all of the parties to this First Amendment had executed the same counterpart. Electronically delivered signatures shall operate as originals for all purposes under this First Amendment.

Exhibit B

IN WITNESS WHEREOF, the parties have executed this First Amendment effective as of this 8th day of February, 2016.

SELLER:

Shilo Inn, Seaside East, LLC
By: Shilo Seaside East Corp
its manager

By: _____

Mark Hemstreet, Secretary

PURCHASER:

_____

Ganesh Sonpatki

Exhibit B

**SECOND AMENDMENT TO
SHILO INN SEASIDE EAST
PURCHASE AND SALES AGREEMENT**

SELLER:          Shilo Inn, Seaside East, LLC, an Oregon limited liability company

PURCHASER:    Ganesh Sonpatki

## RECITALS

A.     Purchaser and Seller are parties to that certain Shilo Inn Seaside East Purchase and Sales Agreement dated effective December 11, 2015, as amended by that certain First Amendment to Shilo Inn Seaside East Purchase and Sales Agreement dated February 8, 2016 (collectively, the "Sales Agreement") in respect of the real property commonly known as the Shilo Inn located at 900 S. Holladay, Seaside, Oregon 97138, which Property is more particularly described in the Sales Agreement.

B.     Purchaser and Seller wish to further amend the Sales Agreement on the terms and conditions set forth herein.  All capitalized terms used in this Second Amendment that are not otherwise defined will have the same meanings given them in the Sales Agreement.

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby affirmed, Purchaser and Seller agree as follows:

## AGREEMENTS

1.     **Release of Portion of Earnest Money**.  In consideration of Seller granting the extensions contained in this Second Amendment, $10,000 of the Earnest Money shall be immediately released to Seller by Escrow Holder, and such amount shall be for all purposes non-refundable to Purchaser, but still applied to the Purchase Price at Closing.  Full execution of this Second Amendment by the parties shall also serve as express written instructions to Escrow Holder to immediately release the $10,000 to Seller.

2.     **Extension of Financing Contingency Period**.  Section 5.1.2(a) of the Sales Agreement is hereby amended such that the Financing Contingency Period is extended to and shall end on March 21, 2016.  The parties acknowledge and agree that any further extension of the Financing Contingency Period shall be on terms mutually agreed upon by the parties, and if any further extension is granted by Seller beyond March 21, 2016, the remaining $40,000 of the Earnest Money held by Escrow Holder shall be immediately released to Seller and shall be for all purposes non-refundable to Purchaser.  Purchaser agrees to immediately submit applications for financing to (at a minimum) two (2) other lenders in addition to Wells Fargo.  Purchaser shall continue to provide the financing progress reports and documents required in Section 5.2 of the Sales Agreement.

Exhibit B

3.     **Closing Date**.  The parties shall agree upon a mutually acceptable Closing Date prior to the expiration of the Financing Contingency Period (or any further extension thereof).

4.     **No Other Modification**.   Except as specifically set forth herein, the Sales Agreement is unmodified and is hereby ratified and remains in full force and effect.

5.     **Counterparts: Electronic Signatures**.    This Second Amendment may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which, when taken together shall constitute one and the same instrument, with the same effect as if all of the parties to this Second Amendment had executed the same counterpart. Electronically delivered signatures shall operate as originals for all purposes under this Second Amendment.

IN WITNESS WHEREOF, the parties have executed this Second Amendment effective as of this 15th day of February, 2016.

SELLER:               Shilo Inn, Seaside East, LLC
                      By: Shilo Seaside East Corp
                      its manager

                      By: _____
                           Mark Hemstreet, Secretary


PURCHASER:            _____
                      Ganesh Sonpatki


Second Amendment to Shilo Inn Sales Agreement

2

Exhibit B

**THIRD AMENDMENT TO**
**SHILO INN SEASIDE EAST**
**PURCHASE AND SALES AGREEMENT**

SELLER:          Shilo Inn, Seaside East, LLC, an Oregon limited liability company

PURCHASER:    Ganesh Sonpatki

## RECITALS

A.     Purchaser and Seller are parties to that certain Shilo Inn Seaside East Purchase and Sales Agreement dated effective December 11, 2015, as amended by that certain First Amendment to Shilo Inn Seaside East Purchase and Sales Agreement dated February 8, 2016, and that certain Second Amendment to Shilo Inn Seaside East Purchase and Sales Agreement dated February 15, 2016 (collectively, the "Sales Agreement") in respect of the real property commonly known as the Shilo Inn located at 900 S. Holladay, Seaside, Oregon 97138, which Property is more particularly described in the Sales Agreement.

B.     Purchaser and Seller wish to further amend the Sales Agreement on the terms and conditions set forth herein. All capitalized terms used in this Third Amendment that are not otherwise defined will have the same meanings given them in the Sales Agreement.

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby affirmed, Purchaser and Seller agree as follows:

## AGREEMENTS

1.     **Closing Date**. The Closing Date shall be on or before June 1, 2016.

2.     **No Other Modification**. Except as specifically set forth herein, the Sales Agreement is unmodified and is hereby ratified and remains in full force and effect.

3.     **Counterparts: Electronic Signatures**. This Third Amendment may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which, when taken together shall constitute one and the same instrument, with the same effect as if all of the parties to this Third Amendment had executed the same counterpart. Electronically delivered signatures shall operate as originals for all purposes under this Third Amendment.

Exhibit B

IN WITNESS WHEREOF, the parties have executed this Third Amendment effective as of March 23, 2016.

SELLER:                Shilo Inn, Seaside East, LLC
By: Shilo Seaside East Corp
its manager

By: _____
Mark Hemstreet, Secretary

PURCHASER:

_____
Ganesh Sonpatki

Exhibit B

# EXHIBIT C

Exhibit C

### SHILO INN MOSES LAKE
### PURCHASE AND SALE AGREEMENT

DATE:               August 11, 2016 (the "Effective Date")

SELLER:             Shilo Inn, Moses Lake, Inc., a Washington corporation
                    11600 SW Shilo Lane
                    Portland, Oregon 97225

BUYER:              Somnath Motel, LLC, a Washington limited liability company

Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller the real property leasehold interest and improvements, and related personal property, described below on the terms and conditions set forth in this Shilo Inn Moses Lake Purchase and Sale Agreement (the "Agreement"):

1.   **The Hotel**.  The property to be sold under this Agreement is as follows:

1.1   The real property leasehold interest and the improvements commonly known as the SHILO INN MOSES LAKE, consisting of approximately 100 hotel units and commercial deli-mart located at 1819 E. Kittleson Rd., Moses Lake, WA 98837 (the "Leasehold"). The legal description of the real property covered by the Leasehold is attached as **Exhibit A**. The real property is leased from the Washington Department of Natural Resources ("DNR") under a long term ground lease ("DNR Ground Lease").

1.2   The buildings and other improvements located on the Leasehold (the "Improvements").

1.3   The furniture, fixtures, and equipment (the "FF&E") owned by Seller used in the operation of the Hotel on hand at Closing (defined in Section 12.1 below), AS IS WHERE IS, consisting primarily of guest room furniture, furnishings and electronics, lobby and public area furniture and furnishings, office computers and equipment, housekeeping and maintenance equipment and supplies, pool equipment and supplies, and the like.  The parties shall prepare an inventory of the FF&E prior to Closing, and will attach as **Exhibit B** hereto.

1.4   All supplies and consumables on hand at the Hotel at Closing consisting primarily of sheets, pillow cases, towels, toilet paper, and cleaning supplies.

The FF&E and the tangible personal property set forth in Sections 1.3 and 1.4 are referred to as the "Personal Property."

1.5   All vendor or supplier contracts related to the operation of the Hotel, and all highway or other off-premises advertising signs advertising the Hotel, which will be assumed by Buyer.  Buyer will be obligated to assume all contracts relating to the operation of the Hotel, unless Buyer agrees to pay any termination fee or liquidated damages incurred by Seller if the

Page 1. Shilo Inn Moses Lake Purchase and Sales Agreement

Exhibit C

contract is not assumed.  Seller will provide Buyer with a list and copies of all contracts applicable to the operation of the Hotel during the Due Diligence Period (defined in Section 5).

1.6    All existing guest reservations, group bookings, or other commitments for future guest lodging relating to the Hotel existing as of Closing, which Buyer agrees to honor.

1.7    To the extent assignable, Seller assigns its rights to telephone numbers solely servicing the Hotel, guest lists, plans and specifications for the buildings and improvements on the Leasehold, warranties and any guaranties that may exist pertaining to the FF&E.

1.8    Seller's interest as landlord in that certain Commercial Deli Mart Lease dated July 15, 2009, as amended. The current tenant under the Commercial Deli Mart Lease is Kang Global Investments, LLC. The assets being sold pursuant to this Agreement do not include the tenant's equipment or inventory used in the operation of the deli mart business operated on the premises leased under the Commercial Deli Mart Lease.

1.9    The Leasehold, Improvements, the Personal Property, the intangible property referenced in Sections 1.5, 1.6 and 1.7, and the Seller's interest in the Commercial Deli Mart Lease will be collectively referred to in this Agreement as the "Hotel".

2.    **Purchase Price Exclusions**.  The Purchase Price for the Hotel EXCLUDES, and Buyer will obtain no interest in, any of the following (except as otherwise set forth below):

2.1    The Shilo Inn® name, including all derivatives thereof ("Shilo Service Mark" or collectively the "Shilo Service Marks").

2.2    Any and all signage containing a Shilo Service Mark. Unless otherwise agreed to by the parties in writing after the execution of this Agreement Buyer will, at Buyer's cost: (i) remove all signage from the interior and exterior of the Hotel containing a Shilo Service Mark; and (ii) remove all personal property containing a Shilo Service Mark; within thirty (30) days after Closing and make the same available to Seller, or, if Buyer elects to enter into an agreement with SFI (as defined in Section 4 below) to continue to operate the Hotel as a Shilo Inn, then Buyer will remove the signage and personal property referenced above and make it available to Seller within thirty (30) days after termination of such agreement. This provision will survive the Closing.  Seller shall have the right to inspect the Hotel, on 24-hour written notice, after the 30-day period to ensure all Shilo Service Marks have been fully removed.

2.3    Any brochures, soap, shampoo, ice buckets, faucet handles or other items of equipment, fixtures, consumables or supplies on which the Shilo Service Marks are printed or affixed. If Buyer elects to enter into an agreement with SFI to continue to operate the Hotel as a Shilo Inn after Closing, Buyer may continue to use such items of equipment, fixtures, consumables or supplies while that agreement is in effect.

2.4    The Hotel property management system or software used by, or licensed to, Seller in connection with its operation of the Hotel.

Exhibit C

2.5    All manuals, corporate records and other private Shilo Inn documents, emails, and related information.

2.6    Any of the data capture equipment, credit card processing machines, and any computer software to which the Seller has no transferable rights or which are tied to Shilo Inn systems and servers.

2.7    The shuttle van currently located at the Hotel is owned by Shilo Management Corporation and not the Seller. The van is a 1999 GMC Savanna Shuttle Van and is valued at $2,011. Buyer may elect to purchase the van from Shilo Management Corporation as a part of this transaction. The purchase price of the van is not a part of the Purchase Price.

3.    **Purchase Price**. The purchase price for the Hotel is Two Million Six Hundred Fifty Thousand Dollars ($2,650,000.00) (the "Purchase Price"). The Purchase Price is firm, non-negotiable and is payable in U.S. currency at Closing. The Purchase Price will be allocated as follows:

| | | |
|---|---|---|
| Improvements | | $2,200,000 |
| FF&E | | $ 450,000 |
| | Total | $2,650,000 |

4.    **Brand License Agreement**. On or before expiration of the Due Diligence Period (as defined in Section 5.1.1 below), Buyer may elect to continue to operate the Hotel as a Shilo Inn on a month-to- month basis pursuant to a brand license agreement (the "License"). The License will be a separate written agreement to be executed and delivered at Closing. The License will provide that during such operating period, provided that Buyer maintains Shilo hotel standards of cleanliness and customer service, Buyer may continue to use the Shilo Service Marks and an affiliate of Seller, Shilo Franchise International, LLC ("SFI") will continue to take reservations (through all SFI portals including telephone, website, and online booking services) for the Hotel while operated under the Shilo Inn name. The License will also provide: (i) for no initiation or application fee; (ii) a monthly license fee equal to 4% of gross room revenue for the first 2 years, 6% of gross room revenue for years 3 and 4 and 8% of gross room revenue for years 5-10; (iii) for Buyer reimbursement of all commissions and booking fees incurred by SFI relating to bookings for the Hotel; (iv) that it is terminable without penalty by either party on thirty (30) days' notice; and (v) that if the period operating under the Shilo Inns brand extends beyond 3 months from Closing, a reasonable, agreed upon property improvement plan ("PIP") of a minimum of $350,000 will be implemented to assure that the Hotel continues to meet the Shilo Inn facility standards. If the parties are unable to agree to the terms of the License, Buyer will immediately discontinue operating the Hotel as a Shilo Inn at Closing, and at Buyer's sole cost and expense will comply with removal of any signage and personal property bearing any Shilo Service Mark as provided in Section 2. Buyer understands and agrees that the failure to remove such Shilo Service Marks will result in damage to Seller, so Buyer agrees to work in good faith to immediately remove such items. Buyer's removal of any signage bearing a Shilo Service Mark must be done in a commercially reasonable manner and Buyer and Seller will work together to create a punch list of "Shilo Inn" items that Seller wishes to salvage, in Seller's sole discretion, and which Buyer will remove at Buyer's cost by means to minimize any damage to

Exhibit C

the salvaged items.  Seller will have thirty (30) days to retrieve any such salvaged items from the Hotel, at Seller's cost, at which point they will be deemed abandoned and Buyer may discard them, unless further reasonable time is agreed to buy Buyer and Seller to remove such items.  To the extent there are any inconsistencies between the provisions of this Section and Section 2.2, the provisions of this Section 4 shall be controlling.

5. **Conditions**.

    5.1    <u>Buyer's Conditions</u>. The obligation of the Buyer to purchase the Hotel is subject to the fulfillment of each of the following conditions, which are for the benefit of the Buyer:

        5.1.1    <u>Due Diligence</u>.  Buyer will have a due diligence period (the "<u>Due Diligence Period</u>") ending at 11:59 p.m. (Portland, Oregon time) on August 29, 2016, to perform any inspections, evaluations and due diligence with respect to Buyer's purchase of the Hotel as Buyer deems necessary, provided, however, that Buyer will not conduct any environmental assessment that would require soils analysis, groundwater testing, or other studies commonly associated with a Phase II environmental site assessment without the prior written consent of Seller in each instance, which consent may be withheld or conditioned in Seller's sole discretion. If Buyer timely elects to terminate this Agreement on before expiration of the Due Diligence Period, then the Earnest Money shall be returned to Buyer and neither party shall have any further rights, obligations, liabilities, or remedies under this Agreement (except for any obligations expressly surviving such termination hereunder).  If Buyer fails to elect to terminate this Agreement prior to the expiration of the Due Diligence Period, then Buyer shall be obligated to proceed to Closing as provided herein except in the event that Buyer terminates this Agreement as otherwise expressly authorized by this Agreement.  Seller shall, on or before August 23, 2016, make available to Buyer reasonable information regarding the Hotel that Seller has in its possession or that Seller can reasonably obtain, including but not limited to the DNR Ground Lease, all contracts referred to in Section 1.5, the Commercial Deli Mart Lease; a list of all guest reservations, group bookings or other commitments for future guest lodging relating to the Hotel existing as of Closing as described in Section 1.6; a list of all assignable telephone numbers, guest lists, plans and specifications for the buildings and improvements on the Leasehold; and all warranties and any guarantees pertaining to the FF&E as described in Section 1.7.  Seller will also permit and, to the extent reasonably required by Buyer, assist Buyer in providing access to the Hotel in connection with Buyer's review of the Hotel. Such grant of access to the Hotel by Seller to Buyer will be very discreet and will minimize contact with the Hotel's staff, and will not disclose that the Hotel potentially may be sold to any third party. Buyer agrees not to contact Seller's lender or any vendor of Seller without prior written consent of Seller, which may be withheld in Seller's sole discretion. Buyer will schedule and coordinate all inspections, including, without limitation, any environmental tests, with Seller and will give Seller at least two (2) business days prior written notice thereof. Seller will be entitled to have a representative present at all times during each such inspection. All costs and expenses of Buyer's tests, inspections, and studies must be paid by Buyer when due, regardless of whether this transaction closes. Buyer will indemnify, defend, and hold harmless Seller from and against any and all costs, losses, damages, expenses, liabilities, actions, liens, or claims arising from or related to any activities on or about the Hotel by Buyer or any agent, employee, contractor, or

Exhibit C

invitee of Buyer. This agreement to indemnify, defend, and hold harmless Seller will survive Closing or any termination of the Agreement.

5.2     Seller's Conditions. The obligation of the Seller to sell the Hotel is subject to the fulfillment of each of the following conditions, which are for the benefit of the Seller.

5.2.1     Financing Reports.    Within five (5) business days from the date of execution of this Agreement, Buyer will provide Seller with a written disclosure of Buyer's proposed financing source(s), if any. Buyer will submit to Seller weekly (beginning with the first Friday after the expiration of 10 days after the execution of this Agreement and on Friday of each following week updates regarding the status of its financing application(s. Upon receipt of any written lending commitment, Buyer will provide Seller a copy.

5.2.2     Consent of Existing Lender.  Seller shall have obtained the approval and consent of Seller's existing Lender to the sale of the Hotel and the release of the existing Lender's lien on the Hotel at Closing.  If existing Lender does not consent to the sale and the release of its lien at Closing, the Earnest Money shall be refunded to Buyer.

5.2.3     Consent of Landlord.  Seller and Buyer shall have obtained the consent to assignment of the Leasehold by DNR.  If DNR does not consent to the assignment of the Leasehold, the Earnest Money shall be refunded to Buyer.  Buyer and Seller will reasonably cooperate to provide DNR with all documents requested by it in connection with the assignment of the Leasehold, including, without limitation, financial statements, tax returns, organizational documents and other related information, as applicable.

6.     **Condition of Title/Insurance**.

6.1     Title Report.  Seller will cause Title Company (as defined below) to furnish to Buyer a preliminary title report for the Leasehold (the "Title Report"), together with copies of all underlying title documentation which are referred to as exceptions in the Title Report.  Not later than five (5) business days after delivery of the Title Report, Buyer will notify Seller and Escrow Holder (identified in Section 10) in writing of any objections it may have to any title matters (other than the Permitted Exceptions, as defined below, which are deemed approved by Buyer under this Agreement) which materially and adversely affect the Hotel in its current use. Buyer's failure to notify Seller and Escrow Holder in writing within such time period of its disapproval of the condition of title of the Hotel as provided above shall constitute Buyer's unconditional and irrevocable approval of the title condition of the Hotel.  In the event Buyer provides such notification of title objection, Seller will have five (5) business days to notify Buyer of its intent to cure or cause the removal of any title objection. Seller may, but will not be obligated to, cure or cause the removal of a title objection. If Seller is unable or unwilling to cure or cause the removal of a title objection of Buyer, Buyer may, by making a written election within five (5) business days of Seller's notice, elect to waive the title objection and proceed to Closing, or notify Seller that it elects to terminate the Agreement, whereupon the Earnest Money will be refunded to Buyer and neither party will have any further obligation to the other, except as otherwise provided in this Agreement. If Buyer fails to make an election based on Seller's notice within the five business day period, Buyer will be deemed to have waived the title

Exhibit C

objection and elected to proceed to Closing. The following title matters are hereby approved by Buyer and will be deemed permitted title exceptions at Closing (collectively, the "Permitted Exceptions"): (a) real or personal property tax liens and assessments that will be paid or as applicable prorated at Closing; (b) all preprinted or standard exceptions on the Title Report; (c) matters (including matters shown in the Title Report) which are approved or deemed approved by Buyer as provided in this Section 6; (d) any matters created or caused by Buyer (including any matters related to the loan obtained by Buyer to acquire the Hotel); and (e) such other matters, if any, as may be approved in writing by Buyer.  Seller will also provide the Title Company with an Owner's Affidavit on a form acceptable to Title Company and Seller to enable Title Company to remove the standard exceptions for parties in possession and mechanic's liens for work performed during the ninety (90) day period preceding the Closing.

6.2    Title Policy.  At Closing, Title Company will cause to be issued to Buyer, at Seller's expense, a standard form ALTA 2006 leasehold owner's policy of title insurance with respect to the Leasehold (the "Title Policy") dated as of the Closing Date (described in Section 12.1), insuring title to the Leasehold vested in Buyer subject to the Permitted Exceptions, with liability in an amount equal to the value of the Leasehold and improvements (as determined by Seller in good faith).  If Buyer desires any endorsements to the Title Policy or an extended ALTA policy of title insurance, Buyer will pay the entire cost of such endorsements and the increased cost of the extended ALTA Title Policy over the cost of the Title Policy and the cost of any survey prepared to obtain an extended ALTA Title Policy, provided that the issuance of any endorsement or an extended ALTA policy will not be a condition to Buyer's obligations hereunder and shall not delay Closing.

7.    **Seller Representations and Warranties**. Seller represents, to the best of its knowledge, that:

7.1    No Condemnation. There is no pending or threatened condemnation or similar proceeding affecting the Hotel nor is any such proceeding contemplated by any governmental authority.

7.2    Seller Not a Foreign Person. Seller is not a foreign national within the meaning of Section 1445 of the Internal Revenue Code of 1986.  The Seller will sign an affidavit to this effect to be delivered to Buyer at Closing, to include Seller's tax identification number.

As used in this section, Seller's knowledge means the actual personal knowledge of Mark Hemstreet, without a duty to inquire or investigate.

8.    **Hotel Sold As Is**.

8.1    No Warranty. Buyer acknowledges that Buyer will have on or prior to the Closing Date, or had the opportunity to assess, the size, configuration, utility service, environmentally sensitive areas, means of access, permitted uses, status of title, value, condition, feasibility, and all other material aspects of the Hotel. Except as specifically stated in Section 7, Buyer is not relying on, nor has Buyer been influenced by, any statement or representation of Seller or any agent or representative of Seller regarding any of such items.  Buyer's acceptance of the Hotel

Exhibit C

will be evidenced solely by the closing of this transaction and without any other act or confirmation by Buyer. Buyer does not have the option to close this transaction without accepting the Hotel in its then current condition, and Buyer acknowledges that Buyer is acquiring the Hotel "AS IS, WHERE IS" in its current condition existing as of the Closing Date, without any representation or warranty of any kind or nature by Seller except as set forth in Section 7. Seller makes no representation or warranty, express or implied, including any warranty of merchantability or fitness for a particular purpose, with the respect to the FF&E, all of which is sold AS IS, WHERE IS, WITH ALL FAULTS.

8.2    Release. As part of the consideration for this Agreement, Buyer agrees that except for any breach by Seller of an express representation or warranty set forth in Section 7 of this Agreement, Seller has no liability, and Buyer hereby waives any claims and releases Seller for all liability, for any title, physical condition, or any other aspect of the Hotel, whether direct or indirect, absolute or contingent, foreseen or unforeseen, and known or unknown. The waiver and release extends to Seller and Seller's affiliates, successors, members, officers, employees, and agents, and their respective heirs, successors, and assigns. Without limiting the generality of the foregoing, Buyer waives all rights to contribution, offsets, and damages that in any manner relate to the compliance of the Hotel with any law or regulation applicable thereto, including, without limitation, the Americans with Disabilities Act, 42 USC §§12101–12213; the Fair Housing Act, 42 USC §§3601–3631; the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC §§9601–9675; the Resource Conservation and Recovery Act, 42 USC §§6901–6992k; the Clean Water Act, 33 USC §§1251–1387; the Safe Drinking Water Act, 42 USC §§300f–300j-26; the Hazardous Materials Transportation Act, 49 USC §§5101–5128; the Toxic Substances Control Act, 15 USC §§2601–2692; and any and all other federal, state, and local personal disabilities and environmental laws or regulations.

9.    **Risk of Loss and Condemnation**. If at any time prior to Closing, all or any portion of the Hotel is (a) taken by the exercise of eminent domain, or under threat of or in lieu of the exercise of eminent domain (a "Taking"), or (b) damaged by fire or other casualty (a "Casualty Loss"), then in either such case Seller shall immediately give Buyer written notice thereof. Buyer shall have the option, exercisable by written notice given to Seller within ten (10) days after Seller gives Buyer notice of the occurrence of such Taking or Casualty Loss, as applicable (and Closing shall be extended, if necessary, in order to afford Buyer the benefit of the entire 10-day period), either to (i) proceed with the Closing, with the Hotel "as is," without a reduction of the Purchase Price and otherwise as provided by this Agreement; or (ii) terminate this Agreement. If Buyer elects to proceed with the Closing, with the Hotel "as is," without a reduction of the Purchase Price and otherwise as provided by this Agreement, then on the Closing Date, in connection with such Taking or Casualty Loss, as applicable, Seller shall (y) pay to Buyer any and all condemnation awards and/or insurance proceeds collected as of the Closing Date to the extent not previously expended in restoration of the Hotel; and (z) assign to Buyer at Closing any and all uncollected condemnation awards and/or insurance proceeds and any right to claim additional awards and proceeds. If Buyer elects to terminate this Agreement, then the Earnest Money shall be returned to Buyer and this Agreement shall thereupon terminate neither party hereto shall have any further rights, obligations, liabilities, or remedies hereunder (except for any obligations expressly surviving such termination hereunder).

Exhibit C

10.   **Escrow and Earnest Money**. Escrow has been opened with Ticor Title Insurance Company, 111 SW Columbia, Suite 1000, Portland, Oregon 97201 Attn: Candice Weischedel ("Escrow Holder") and Escrow Holder and its affiliate title company(ies) will administer Closing ("Title Company"). Buyer has deposited Fifty Hundred Thousand Dollars ($50,000.00) ("Earnest Money") with the Title Company. Buyer will receive credit for the Earnest Money on the Purchase Price at Closing. To the extent this Agreement is still in effect, Twenty Five Thousand Dollars ($25,000) of the Earnest Money shall become nonrefundable (except as otherwise set forth herein) at 12:01 a.m. on August 16, 2016. If Buyer fails to terminate this Agreement prior to the expiration of the Due Diligence Period, then the remaining Twenty Five Thousand Dollars ($25,000) of the Earnest Money held in escrow shall become non-refundable to Buyer (except as otherwise set forth herein) and immediately released to Seller.   Provided, however, that notwithstanding anything contained herein to the contrary, the Earnest Money shall be refundable to Buyer, in full: (i) in the event of Buyer's election to terminate this Agreement or Seller's failure to deliver clear and marketable title to the Hotel (Section 6.1); (ii) DNR's failure to consent to the assignment of the DNR Ground Lease (Section 5.2.3); (iii) existing lender's failure to consent to and approve of the sale and release its lien (Section 5.2.2); (iv) occurrence of Casualty Loss or Taking (Section 9); and (v) Seller's default ( Section 11.2).

11.   **Default**.

11.1   Buyer Default.  If the sale of the Hotel is not consummated due to any default or breach by Buyer or for any other reason other than a material default by Seller or the failure of any of the conditions set forth herein, the Earnest Money will constitute liquidated damages and the Seller agrees this is Seller's sole and exclusive remedy, it being agreed between the parties hereto that the actual damages to Seller in the event of such failure are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate thereof.  BY SIGNING THIS AGREEMENT THE PARTIES ACKNOWLEDGE THAT THE EARNEST MONEY HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLER'S DAMAGES AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER, AT LAW OR IN EQUITY, IN THE EVENT OF A FAILURE BY BUYER TO CLOSE WHEN OBLIGATED TO DO SO UNDER THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY.

11.2   Seller Default.  If the sale of the Hotel is not consummated due to any material default or breach by Seller, Buyer may terminate this Agreement and will be entitled to a return of the Earnest Money, but in no event will there be a right to sue for specific performance, damages, or other similar legal or equitable claim.

12.   **Closing**.

12.1   Date and Place of Closing.  Closing will take place through Escrow Holder's title office on or before September 27, 2016 (the "Closing" or "Closing Date").

12.2   Closing Costs.  At Closing, Seller will be responsible for:  fees of its own legal counsel; the premium for the Title Policy; real property excise tax, recording fees, if any, relating to the release of Seller's current mortgage; and one-half of escrow fees.  At Closing, Buyer will

Page 8. Shilo Inn Moses Lake Purchase and Sales Agreement

Exhibit C

be responsible for: fees of its own legal counsel; all due diligence costs; the survey, if one is required; the premium of any extended title insurance and any endorsements; recording fees, if any (other than those specified above to be paid by Seller), use taxes, if any; one-half of escrow fees, and any fees or costs charged by DNR in connection with its consent to the assignment of the DNR Ground Lease.

     12.3    <u>Adjustments at Closing</u>. At Closing, prorations and the closing procedure relating to Hotel operations will take place as set forth on **Exhibit C**.

     12.4    <u>Seller's Closing Obligations</u>. At the Closing, Seller will deliver the following or cause the following to be delivered to Escrow Holder or to Buyer, as indicated:

        12.4.1  To Buyer, possession of the Hotel, including, without limitation, all keys, codes and passwords necessary to fully operate the Hotel**;**

        12.4.2  To Escrow Holder, for delivery to Buyer, the following documents:

           (a)    The assignment and assumption of the Leasehold in form approved by Seller and Buyer prior to Closing to be attached as **Exhibit D** (the "<u>Assignment</u>") executed by Seller and approved by DNR, in writing, conveying to Buyer the Leasehold, subject only to the Permitted Exceptions;

           (b)    A quitclaim deed conveying the Improvements to Seller in form approved by Seller and Buyer prior to Closing to be attached as **Exhibit E**, subject only to the Permitted Exceptions.

           (c)    A Bill of Sale, Assignment and Assumption Agreement in form approved by Seller and Buyer prior to Closing to be attached as **Exhibit F** (the "<u>Bill of Sale</u>") executed by Seller conveying to Buyer the Personal Property, the intangible property, and the Commercial Deli Mart Lease;

           (d)    An affidavit of Seller conforming with the requirements of Section 1445 of the Internal Revenue Code, the Patriot Act, or any other law, statute or regulation affecting the Leasehold or the transactions contemplated by this Agreement;

           (e)    An ALTA Statement, on Escrow Agent's standard form, if required, executed by Seller;

           (f)    Such other documents and information as the Title Company reasonably requires to issue the Title Policy with any requested endorsements;

           (g)    Escrow Holder's escrow instructions with Escrow Holder's commercially reasonable standard provisions and requiring Escrow Holder to comply with the provisions of this Agreement and record and deliver the documents set forth in, and as contemplated by, this Agreement, signed by Seller;

           (h)    A Closing Statement executed by Seller;

           (i)    The License, if Buyer elects to operate the Hotel as a Shilo Inn after Closing, signed by an affiliate of Seller;

Exhibit C

        (j)    A covenant not to compete in form attached as **Exhibit G**, signed by Mark and Shannon Hemstreet; and

        (k)    A certificate of title for the van referenced in <u>Section 2.7</u>, duly signed by Shilo Management Corporation if Buyer elects to purchase.

        (l)    A Tax Clearance or Status Certificate issued by the Washington State, Department of Revenue, indicating there are not taxes due.

12.5   <u>Buyer's Closing Obligations</u>.  At the Closing, Buyer will deliver to Escrow Holder:

      12.5.1 By wire transfer, the Purchase Price (subject to any credit for the Earnest Money deposited and any credit from prorations);

      12.5.2 Escrow Holder's escrow instructions with Escrow Holder's commercially reasonable standard provisions and requiring Escrow Holder to comply with the provisions of this Agreement and record and deliver the documents set forth in, and as contemplated by, this Agreement, signed by Buyer;

      12.5.3 A closing statement setting forth all of the payments and prorations to be made in the consummation of the sale hereunder in accordance with the provisions of this Agreement executed by Buyer;

      12.5.4 The License, if Buyer elects to operate the Hotel as a Shilo Inn after Closing, signed by Buyer;

      12.5.5 The Assignment, signed by Buyer; and

      12.5.6 The Bill of Sale, signed by Buyer.

13.    **Indemnity**. Each of the Seller and the Buyer will indemnify and defend the other party, to include attorneys' fees and costs, for any and all claims, costs, losses or damages, whether in contract or in tort, arising or alleged to arise during the period for which each party is responsible. The Seller will be responsible for all Operational Taxes (as defined in Section 1.1.5 of Exhibit C), and all claims, costs, losses or damages accruing or incurred with respect to the Hotel prior to the Closing Date. Buyer will be responsible for Operational Taxes (as defined in Section 1.1.5 of Exhibit C) and all claims, costs, losses or damages accruing or incurred on or after the Closing Date. Buyer will accept and pay for any goods and services necessary for the reasonable operation of the Hotel, which were ordered prior to Closing but delivered or rendered after Closing. In addition, Buyer will be solely responsible for any lien, claim or amount related to any third party vendor retained by Buyer or Buyer's representative related to this Agreement whether or not Closing occurs.

14.    **Additional Covenants of the Parties**.

Exhibit C

14.1    Parties Bound.  This Agreement is binding upon and inures to the benefit of the parties' heirs, successors, and permitted assigns.  If Buyer is comprised of two or more parties, they shall be jointly and severally obligated under this Agreement.

14.2    Assignment.  Buyer may, upon written notice to Seller, assign its rights under this Agreement, without the prior written consent of Seller, to an affiliated entity which is owned or controlled by Buyer. Except as provided for in the preceding sentence, Buyer may not assign or otherwise transfer this Agreement or any interest herein, voluntarily, involuntarily, or by operation of law, without the prior written consent of Seller in each instance.

14.3    Survival.  The covenants of each party contained in this Agreement will survive Closing and will not merge into any document delivered at Closing.

14.4    Entire Agreement.  This Agreement constitutes the entire agreement of the parties with respect to the sale of the Hotel and supersedes and replaces all written and oral agreements previously made or existing between the parties, including any letter of intent.

14.5    Severability.  If any provision of this Agreement is declared unenforceable by a court having jurisdiction, the provision is ineffective only to the extent declared unenforceable. The remainder of the provision and all other provisions of this Agreement will continue in full force and effect, so long as the basic purpose of the Agreement can be fulfilled.

14.6    Notices.  Any notices to Buyer and Seller will be sent to the following addresses:

To Buyer:

Somnath Motel, LLC
Attn: Keshav Patel
7030 Cascade Avenue SE
Snoqualmie, Washington 98065

Exhibit C

To Seller:

Shilo Inn, Moses Lake, Inc.
Attn: Legal Department
11600 S.W. Shilo Lane
Portland, Oregon 97225

Notices by any party pursuant to this Agreement may be made by hand delivery; certified or registered mail (with return receipt); private carrier (such as, for example, Federal Express) with delivery confirmation. Notices by hand delivery will be deemed received when delivered to the addressee's address; notices by certified or registered mail will be deemed received forty-eight (48) hours after mailing; and notices sent by private carrier will be deemed received when actually delivered.

14.7    Business Day.  Unless otherwise provided herein, where any notice by any party is to be given by a specified date, or on or within a stated number of days after a stated event, the notice will be given on or before 5:00 P.M. Portland, Oregon Time on the required date.  If the required date is a Saturday, Sunday, or not a regular business day, the notice will be given not later than the next business day. All references to 'business days' in this Agreement will mean a day other than a Saturday, Sunday or a federal banking holiday.

14.8    Confidentiality.  Buyer agrees to keep confidential the fact that it is purchasing the Hotel as well as any information or data received or discovered in its review and inspections regarding the Hotel.

14.9    Legal Advice.  Each of the parties hereto have been represented by legal counsel of their choice in respect to this transaction, and each of the parties will be responsible for their own attorney fees incurred in negotiating this Agreement.  This Agreement has been negotiated with each party having the opportunity to consult with legal counsel and will be construed without regard to which party drafted all or any part of this Agreement.

14.10    Headings.  The heading and captions of the sections and paragraphs in this Agreement are used solely for convenience and are not intended to limit or otherwise modify the provisions of this Agreement.

14.11    Waiver.  Failure of either party at any time to require performance of any provision of this Agreement will not limit such party's right to enforce such provision, nor will any waiver of any breach of any provision of this Agreement constitute a waiver of any succeeding breach of such provision or waiver of such provision itself.

14.12    Counterparts.  This Agreement may be executed simultaneously or in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same contract. Either party may rely on facsimile or digitally transmitted copies of this Agreement to the same extent as the originals.

Exhibit C

14.13 <u>Governing Law</u>.    The parties acknowledge that this Agreement has been negotiated and is entered into in the State of Washington.  The parties expressly agree that this Agreement will be governed by, interpreted under, and construed and enforced in accordance with the laws of the State of Washington.

14.14 <u>Broker's Fee</u>.  Seller will pay a broker's fee of Fifty Thousand Dollars ($50,000) at the Closing of the transaction to Walt Bumgarner, Windermere/K-2 Realty. Each party warrants to the other party that no other broker or agent was consulted or engaged in connection with this transaction, and each party will indemnify, defend, and hold harmless the other from and against all claims, losses, and liabilities made or imposed for any commission to any broker or agent (other than the finder's fee referenced above) and arising out of the actions of such party.

14.15 <u>Vendor Contracts</u>.  During the Due Diligence Period, Seller will advise Buyer of all supplier or vendor contracts involving the provision of supplies or services to the Hotel (including billboard or advertising contracts relating solely to the Hotel) and provide copies of the same where available. In the event certain services are provided to Hotel through a multi-property agreement with the Shilo Inn group of hotels, Seller will use commercially reasonable efforts to cause the vendor to separate the Hotel from the multi-property agreement and make the service available on a stand-alone basis to Hotel.

14.16 <u>Attorneys Fees</u>.  If any arbitration, suit, or action is instituted to interpret or enforce the provisions of this Agreement, to rescind this Agreement, or otherwise with respect to the subject matter of this Agreement, the party prevailing on an issue will be entitled to recover with respect to such issue, in addition to costs, reasonable attorney fees incurred in the preparation, prosecution, or defense of such arbitration, suit, or action as determined by the arbitrator or trial court, and, if any appeal is taken from such decision, reasonable attorney fees as determined on appeal.

14.17 <u>Guest Baggage</u>.  All baggage of guests who are still in the Hotel on the Closing Date, which has been checked with or left in the care of the Hotel will be inventoried, sealed, and tagged jointly by Seller and Buyer on the Closing Date.  From and after the Closing Date, Buyer will save, defend, indemnify and hold harmless Seller and its agents, employees, affiliates and representatives from and against any claims, liabilities, losses, damages, costs and expenses in connection with such baggage arising out of the acts or omissions of Buyer or its affiliates (or any of their employees or agents) from and after the Closing Date. From and after the Closing Date, Seller will indemnify and defend Buyer and its agents, employees, affiliates and representatives from and against any claims, liabilities, losses, damages, costs and expenses in connection with such baggage arising out of the acts or omissions of Seller or its affiliates (or any of their employees or agents) prior to the Closing Date.

14.18 <u>Time of Essence</u>.  Time is of the essence for each and every provision of this Agreement.

14.19 <u>Not Binding Until Executed</u>.  By providing an unexecuted copy of this Agreement to any person, neither party is deemed to have made an offer to sell or purchase or otherwise indicated its willingness to enter into any transaction with respect to the Hotel, and this

Exhibit C

Agreement will not be binding on any party unless and until it has been fully executed and delivered by Seller and Buyer.

14.20  <u>Waiver of Jury Trial</u>.    EACH PARTY HERETO VOLUNTARILY AND IRREVOCABLY WAIVES ANY CONSTITUTIONAL OR OTHER RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION ASSERTED IN ANY CIVIL ACTION BY OR AGAINST THE OTHER OF THEM, CONCERNING THIS AGREEMENT, ANY AGREEMENT, INSTRUMENT OR DOCUMENT DELIVERED OR TO BE DELIVERED PURSUANT TO THIS AGREEMENT, ANY ACT OR FAILURE TO ACT WITH RESPECT TO THIS AGREEMENT OR ANY SUCH AGREEMENT, INSTRUMENT OR DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, WHETHER SUCH CLAIM OR CAUSE OF ACTION ARISES UNDER CONTRACT, IN TORT OR OTHERWISE. THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO EXECUTE THIS AGREEMENT AND SHALL SURVIVE CLOSING OR THE EARLIER TERMINATION OF THIS AGREEMENT.

14.21  <u>Legal Relationships</u>.  The Parties to this Agreement execute the same solely as a vendor and a vendee.  No partnership, joint venture or joint undertaking shall be construed from these presents, and except as herein specifically provided, neither Party shall have the right to make any representation for, act on behalf of, or be liable for the debts of the other.

14.22  <u>Construction</u>.  Captions and the organization of paragraphs in this Agreement are for convenience only and shall not be used in construing meaning or interpretation.  The language in all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, strictly neither for or against any Party hereto, and without implying a presumption that the terms of this Agreement shall be more strictly construed against one Party by the reason of the Rule of Construction that a document is to be construed more strictly against the person or such person's representatives who drafted the same.  In the case of this Agreement, the Parties or their representatives have participated in the preparation of this Agreement.  In the event this Agreement is in conflict with the provisions of any laws, statutes or regulations governing the subject matter hereof, such laws, statutes or regulations only to the extent of such conflict shall be controlling and this Agreement shall be deemed to be modified or amended to be in conformity therewith.

14.23  <u>Exhibits</u>.  All documents and instruments exhibited to this Agreement, are incorporated into and made a part of this Agreement as though fully set forth in this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

/
/
/
/
/
/

Exhibit C

SELLER:

Shilo Inn, Moses Lake, Inc.

By: _____

Mark Hemstreet, Secretary

BUYER:

Somnath Motel, LLC

_____

Keshav Patel, Manager

Page 15. Shilo Inn Moses Lake Purchase and Sales Agreement

Exhibit C

Referenced Exhibits:

| | |
|---|---|
| Exhibit A | Legal Description of Leasehold |
| Exhibit B | List of Furniture, Fixtures & Equipment |
| Exhibit C | Proration and Closing Procedure |
| Exhibit D | Assignment and Assumption of the Leasehold |
| Exhibit E | Quit Claim Deed Respecting Leasehold Improvements |
| Exhibit F | Bill of Sale |
| Exhibit G | Covenant Not to Compete |

Exhibit C

**Exhibit A**
**Legal Description**

A leasehold interest in and to the following tract:

Lot 2, Shilo Short Plat, according to the plat thereof recorded in Volume 3 of Short Plats, page 42, records of Grant County, Washington, being a portion of Farm Unit 124, Irrigation Block 41, Columbia Basin Project, and a portion of the Northwest quarter of the Northeast quarter of Section 36, Township 19 North, Range 28 E.W.M., described as follows:

Commencing at the North quarter corner of said Section 36; thence South 89°20'15" East, 702.37 feet along the North line of said Section 36; thence South 00°39'45" West, 30 feet to the True Point of Beginning; thence South 00°39'45" West, 468.82 feet to a point on the Northerly right of way of S.R. 90 Highway; thence Westerly 140.61 feet along a 375 feet radius curve to the left (whose long chord bears South 79°52'18" West, 139.79 feet); thence North 80°52'21" West, 43.75 feet to a point 75 feet perpendicular to the center line of S.R. 17 Highway; thence North 35°52'41" West, 287.31 feet; thence South 89°20'15" East, 73.17 feet; thence North 00°39'45" East, 182.99 feet; thence North 03°42'02" West, 59.91 feet; thence North 00°39'45" East, 15 feet to a point on the Southerly right of way line of Kittleson Road; thence along said right of way line South 89°20'15" East, 283.04 feet to the True Point of Beginning.

Exhibit C

## Exhibit B

### Furniture, Fixtures, and Equipment

Exhibit C

Exhibit C

**Proration and Closing Procedure**

      1.1    <u>Adjustments, Allocations and Prorations</u>.  The following provisions will govern the adjustments and prorations that will be made at Closing and the allocation of income and expenses from the Hotel between Seller and Buyer.  Except as expressly provided to the contrary in this <u>Section 1.1</u>, all items of revenue, cost and expense of the Hotel, with respect to the period prior to 11:59 P.M. (the "<u>Cut-Off Time</u>") on the day prior to the Closing Date, will be for the account of Seller and all items of revenue, cost and expense of the Hotel, with respect to the period after the Cut-Off Time on the day prior to the Closing Date, will be for the account of Buyer.  Any net adjustment in favor of Buyer will be credited against the Purchase Price at the Closing.  Any net adjustment in favor of Seller will be paid in cash or cash equivalent at the Closing by Buyer to Seller.

      1.1.1    <u>Real Property Taxes, Personal Property Taxes, Impositions and Other Assessments</u>.  Real property taxes, personal property taxes, impositions, and other assessments imposed upon or assessed against the Hotel will be prorated as of the Closing Date.  Such proration will be done in accordance with the following provisions:

      (a)    <u>Allocation of Real Property Taxes, Impositions and Other Assessments</u>.  With respect to the Hotel, Seller will be responsible for all real property taxes,, regardless of when payable and when billed, impositions and other penalties, interest and assessments that are attributable to the period prior to the Closing Date, and Buyer will be responsible for all real property taxes,, regardless of when payable and when billed, impositions and other assessments that are attributable to the period from and after the Closing Date.

      (b)    <u>Allocation of Personal Property Taxes, Impositions and Other Assessments</u>.  With respect to the Hotel, Seller will be responsible for all 2016 personal property taxes, regardless of when payable and when billed, impositions and other penalties, interest and assessments that are attributable to the period prior to the Closing Date.  The 2017 advance personal property taxes assessed shall be prorated between Seller and Buyer and shall be deposited with the Closing Agent on the Closing Date for proper payment.  After payment and proration as provided herein, all further personal property taxes shall be paid by Buyer.

      (c)    <u>Proration of Leasehold Rent Payments</u>.  The 2016 DNR Ground Lease annual rent and leasehold tax shall be prorated between the Parties as of the Closing Date.  Percentage rent shall be paid by Seller to DNR for the period from January 1, 2016, to the Closing Date, as part of closing.  Percentage rent for the period following the Closing Date shall be paid by Buyer to DNR when due.

      (d)    <u>Adjustment of Tax Rate or Assessment</u>.  If the real property tax rate, personal property tax rate or any assessment has not been set for the fiscal year in which the Closing occurs, then the proration of such real property tax, personal property tax or assessment will be based upon the rate of the assessment for the preceding fiscal year for such tax or assessment which has not been set for the fiscal year in which the Closing occurs, and

Exhibit C

such proration will be adjusted between Seller and Buyer upon presentation of written evidence of the amount of the actual taxes. Any returns due to outstanding real property tax appeals initiated by Seller will be Seller's sole property and must be immediately remitted to Seller. In addition, any tax appeals by Seller for any time period prior to Closing will belong solely to Seller.

### 1.1.2   Hotel Reservations and Revenues.

(a)    Reservations. Buyer will honor (and will cause its manager to honor) all reservations at the Hotel that are made by Seller in the ordinary course of business on or prior to the Closing Date and pertaining to periods on or after the Closing Date. Any down payments and advance deposits that are (i) received by Seller prior to the Closing Date; and (ii) made with respect to confirmed reservations for dates on or after the Closing Date, will be credited at Closing to Buyer.

(b)    Guest Revenues. Revenues from guest rooms in the Hotel occupied on the night containing the Cut-Off Time, including any sales taxes, room taxes and other taxes charged to guests in such rooms, all telephone, facsimile and data communications, in-room movie, laundry, and other service charges allocated to such rooms with respect to the night containing the Cut-Off Time will be divided evenly between Seller and Buyer or as otherwise agreed to by the parties. All other revenues will be allocated based on whether the same accrued before or after the Cut-Off Time and Seller and Buyer will separately record sales occurring before and after the Cut-Off Time.

### 1.1.3   Petty Cash and Cash on Hand.   The aggregate amount of petty cash and cash on hand at the Hotel as of the Closing Date will be referred to as the "Aggregate Cash Amount." The Aggregate Cash Amount will belong to Buyer; provided, however, that Seller will receive a credit for the same at Closing. Buyer and Seller will have representatives that count such cash together on the morning of the Closing Date. All transferable deposits of Seller made for utilities, maintenance or service contracts, licenses, or otherwise, with respect to the Hotel will be credited to Seller at Closing.

### 1.1.4   Hotel Receivables.   All receivables existing as of the Closing Date will remain the property of Seller. Buyer will remit the receivables to Seller as and when received (for example, a guest group that stays before Closing, but sends payment to the Hotel post-closing). Buyer will have the absolute and unconditional obligation to immediately forward to Seller any funds received by Buyer after Closing representing any revenues for guests stays or rebates earned on or prior to Closing.

Operational Taxes. The parties acknowledge that certain taxes accrue and are payable to the various governmental authorities by any business entity operating a hotel and its related facilities. Included in those taxes may be business and occupation taxes, retail sales and use taxes, gross receipts taxes, and other special lodging or hotel taxes. For purpose of this Agreement, all of such taxes (expressly excluding taxes and assessments covered by Section 1.1.1, corporate franchise taxes, and federal, state, and local income taxes) (hereinafter referred to as "Operational Taxes") will be allocated between Seller and Buyer such that those attributable to the period prior to the Cut-Off Time will be allocable to Seller and those

Exhibit C

attributable to the period from and after the Cut-Off Time will be allocable to Buyer (with the attribution of such taxes hereunder to be done in a manner consistent with the attribution under this Agreement of the applicable revenues on which such taxes may be based). Buyer will receive a credit for any Operational Taxes attributable to the period prior to the Cut-Off Time which Seller has not paid and which Buyer is obligated to pay. Except for the Operational Taxes for which Buyer has received a credit under this Section 1.1.5, Seller will be responsible for payment of the Operational Taxes with respect to the period prior to the Cut-Off Time, and Buyer will be solely responsible for payment of such Operational Taxes with respect to the period from and after the Cut-Off Time. Seller will apply for a tax clearance certificate indicating no taxes due the State of Washington, Department of Revenue with respect to the operation of the Improvements (to be issued by Closing) through the Closing Date.

      1.1.5  Wages and Other Employee Compensation. Seller will terminate all of the Hotel's employees effective as of the Closing Date. Seller will pay to all of the Hotel's employees the wages, salaries, benefits, accrued and unused vacation pay, accrued and unused sick pay, and all other employment related expenses, including payroll taxes (collectively, "Employee Compensation") payable to them as of the Closing Date. Seller will be solely responsible for all Employee Compensation, which accrues on or before the Closing Date. Seller will indemnify and hold Buyer harmless for, from and against any claim by any employee for Seller's failure to pay (a) any severance payment, if any, due such employee, regardless of the period to which the severance entitlement applies, and (b) Employee Compensation which accrues on or before the Closing Date, and Buyer will indemnify, hold harmless and defend Seller for similar amounts for which Buyer or Buyer's agents are responsible on or after Closing Date.

      1.1.6  Permits; Contracts; Rebates. With respect to the Hotel, permit and license fees of assignable permits and licenses, if any, will be prorated as of the Closing Date. Payments due under any service agreements and equipment leases, if any and provided Buyer assumes same, will be prorated as of the Closing Date.

      1.1.7  Other Hotel Operating Expenses. With respect to the Hotel, operating expenses and utility charges (subject to this Section 1.1.8 and Section 1.1.10 below) and expenses under any reciprocal easement, shared use, or operating agreements (if any) with

Exhibit C

a proration will be made at Closing based on the last available reading, and post-closing adjustments between Buyer and Seller will be made as part of the post-Closing reconciliation pursuant to Section 1.1.11, which obligation will survive the Closing and not be merged therein. Any tour agents' and travel agents' commissions will be prorated as of the Closing Date.

         1.1.8  <u>Payment of Credited Amounts</u>.  In any case in which Buyer receives a credit at Closing on account of any obligation of Seller hereunder, Seller will have no further liability for such obligation to the extent of the credit so given, and Buyer will pay and

Page 21. Shilo Inn Moses Lake Purchase and Sales Agreement

Exhibit C

discharge the same, together with any penalties, fines, fees, interest and other charges thereon or related thereto imposed by third parties or by law in connection with Buyer's non-payment of such items, and any legal fees incurred by Seller to enforce the provisions of this <u>Section 1.1.9</u>.

       1.1.9  <u>Items for Which There Will Not be a Proration</u>.  Seller and Buyer agree that (a) none of the insurance policies relating to the Hotel will be assigned to Buyer, and Buyer will be responsible for arranging for its own insurance as of the Closing Date; and (b) utilities, including telephone, electricity, water and gas, will be read on the Closing Date and Buyer will be responsible for all the necessary actions needed to arrange for utilities (including telecommunications such as television and internet) to be transferred to the name of Buyer beginning 12:01 A.M. on the Closing Date, including the posting of any required deposits and cooperation with Seller to get Seller's return of any deposits Seller current has at Closing. Accordingly, there will be no prorations for insurance or utilities, unless a meter reading is unavailable for any particular utility, then such utility will be prorated in the manner provided in <u>Section 1.1.8</u> above.  To the extent reasonably possible, Buyer and Seller will cooperate to arrange for utility and other service providers to separately bill each party for their respective periods of ownership, in which event no credit and no proration will be necessary.  Seller will be entitled to receive and be returned any deposits Seller may have with any utility companies, or will receive a credit at Closing from Buyer to the extent such deposits may be transferred to Buyer's account.

       1.1.10  <u>Closing Statement; Post-Closing Reconciliation</u>.  The prorations and credits hereunder at the Closing will be made based on a closing statement (the "<u>Closing Statement</u>") prepared by Escrow Holder and adjusted as aforesaid and approved in writing by the parties (which approval will not be unreasonably withheld) prior to the Closing, based on actual figures to the extent available provided by the parties to the Escrow Holder.  If any of the prorations cannot be calculated based on actual figures, then they will be calculated based on the parties' good faith estimates, which will be subject to Seller's and Buyer's reasonable approval. As soon as reasonably practicable after the Closing but in no event later than thirty (30) days after the Closing, Seller and Buyer, acting reasonably and in good faith, will reconcile between themselves the amounts to be prorated pursuant to this Agreement, using any updated information with respect to such matters then available.  Each party will provide the other reasonable access to the books, records, computer runs and other documents relating to the Hotel which contain information relevant to completing the final reconciliation.  If the final reconciliation of prorations, as agreed to between Seller and Buyer, shows any amount due from Seller to Buyer, or vice versa, the party owing such amount will pay such amount (in immediately available funds) within five (5) Business Days after reaching agreement on the final reconciliation.

       1.1.11  <u>Survival of Section 1.1</u>.  The obligations and rights of the parties under this <u>Exhibit B</u> will survive the Closing.

Exhibit C

**Exhibit G**

**COVENANT NOT TO COMPETE**

As a material consideration of the Agreement to which this Covenant Not to Compete is attached as Exhibit "G" and for valuable consideration, Mark Hemstreet and Shannon Hemstreet, husband and wife, for and on behalf of themselves and Shilo Inn, Moses Lake (both "Hemstreet") covenant that Hemstreet shall not individually, or as an employee, agent, consultant, independent contractor, shareholder, partner, manager, director or officer of any business competing, directly or indirectly, with Buyer in any hotel/motel business for a period of three (3) years within a radius of fifty (50) miles of the Hotel. Hemstreet acknowledges that the restrictive covenants set forth herein are reasonable and valid in duration, geographical scope, and all other respects. Hemstreet further acknowledges that a breach by Hemstreet of the provisions hereof would cause Buyer irreparable injury and damage which cannot be reasonably or adequately compensated by damages at law. Hemstreet, therefore, expressly covenants that Buyer shall be entitled to injunctive or other equitable relief to prevent a breach of this non-competition covenant in addition to any other remedies legally or equitably available to Buyer. If any court of competent jurisdiction determines that any of the restrictive covenants herein, is or are invalid or unenforceable, the remainder of the restrictive covenants shall not thereby be affected and shall be given full effect, without regard to invalid portions. If any of the provisions herein should ever be deemed to exceed the temporal, geographic or occupational limitations permitted by applicable law or in equity, those provisions shall be and are hereby reformed to the maximum temporal, geographic or occupational limitations permitted by applicable law or in equity.

_____          _____
Mark Hemstreet                            Date


_____          _____
Shannon Hemstreet                         Date

Exhibit C